**UNITED STATES of America**

v.

**Walter E. TRAYER.**

**Crim. A. No. 88–0323.**

United States District Court, District of Columbia.

Dec. 12, 1988.

Theodore A. Shmanda, Asst. U.S. Atty., Washington, D.C., for the Government.

Michael S. Lieberman and Jonathan Mark, Zwerling, Mark, Sutherlund, Ginsberg and Lieberman, Alexandria, Va., for defendant.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

Presently before the Court is the defendant Trayer's motion to suppress evidence taken from him by law enforcement officials on August 3, 1988. Trayer, previously convicted in a Pennsylvania state court for marijuana possession, an offense for which he served 22 months, has been indicted and will be tried before this Court for possession with the intent to distribute cocaine in violation of 21 U.S.C. § 841(a) and (b)(1)(B)(ii). On December 5 and 6, 1988, the Court heard testimony and the arguments of the parties regarding Trayer's efforts to suppress the cocaine discovered at the time of his arrest. Upon consideration of Trayer's motion, the opposition thereto, the evidence adduced at the hearing referred to above, and for the reasons discussed herein, the Court will deny Trayer's motion, and will permit introduction of the cocaine as evidence at trial.

## FACTUAL BACKGROUND

The factual backdrop against which Trayer's motion is decided is simple, and for the most part, undisputed. On August 2, 1988, Officer Suave of the Amtrak police in Washington, D.C., identified from Amtrak records a passenger aboard Train 88/98 from Miami, travelling to Philadelphia, who fit the "drug courier" profile. According to Officer Suave, this passenger, identified on Amtrak's manifest as W. Trayer, had purchased his first-class ticket (which includes a roomette) to Philadelphia, with cash, the evening before the Train's departure. The price of the ticket was $327. Although the ticket was round-trip, with Trayer scheduled to return to Miami on August 25, the return ticket was coach

(non-roomette), rather than first-class. When Officer Suave attempted to reach the "call-back" number given for Trayer at the time the reservation was made, he found that the number had been disconnected. According to Officer Suave's testimony, the confluence of these factors are consistent with the behavior of drug couriers, and led Suave to conclude that further investigation would be appropriate.

Officer Suave contacted the Washington, D.C. Metropolitan Police Department ("MPD") on August 2, and asked for assistance in investigating Trayer when Train 88/98 arrived at Washington's Union Station for a routine stop the following morning at approximately 6:30 a.m. MPD sent two officers, along with "Ben II," a trained narcotics dog. When Train 88/98 arrived at Union Station, all three officers boarded with Ben II at approximately 6:45 a.m.[1] As the officers and the dog moved through the corridor outside Trayer's roomette, Ben II "alerted" at the air vent near the bottom of the door to Trayer's roomette. Officer Buss, Ben II's handler, testified that Ben II had passed several roomette doors without reaction before alerting outside Trayer's door. After being informed by Officer Buss that Ben II had alerted, Officer Suave knocked on Trayer's door. When Trayer answered, Officer Suave notified him that a narcotics dog had indicated the presence of drugs inside, asked for consent to search the roomette, and asked for identification. Other than his train ticket, Trayer was unable to furnish identification.[2] Although he offered Officer Suave his suitbag for inspection, Trayer apparently did not consent to the general search of the roomette.

Notwithstanding Trayer's apparent refusal to consent, Office Suave, apparently unassisted, proceeded to search the roomette.[3] He immediately located a leather briefcase which had been placed behind a collapsible seat. With Trayer in tow, Officer Suave removed the briefcase from the roomette and exposed it to the narcotics dog on the platform outside the train. The narcotics dog alerted to the briefcase aggressively, attempting to bite at the corners. The officers then placed Trayer under arrest, and removed both him and the briefcase to an office inside Union Station while the officers obtained a warrant to search the briefcase. According to testimony, the entire process, from entry on the train until Trayer's arrest and transfer to the office, took from 10 to 15 minutes, so that Trayer was arrested around 7:00 a.m. The warrant was returned to Union Station at approximately 10:00 a.m. A search of the briefcase at Union Station pursuant to the warrant revealed what appeared to be a quantity of cocaine. A field test established that the substance was in fact cocaine. A criminal complaint was filed against Trayer that day.[4]

## DISCUSSION

Trayer seeks to suppress the cocaine found in his briefcase on three grounds: (1) that the officers lacked probable or reasonable cause to search his roomette, and thereby violated his Fourth Amendment rights in so doing; (2) that the officers effectively placed Trayer under arrest in his roomette without probable cause to do so; and (3) that a narcotics dog is insufficiently reliable to provide probable cause, and that as a result the warrant to search Trayer's briefcase was improperly issued in this case.

■ As to the first of Trayer's contentions, that the officers violated his Fourth

1. There was testimony at the hearing that the interior of the train was dark as the officers boarded, due to the fact that the train's engines had been shut down while in the station. As a consequence, the officers were forced to use flashlights as they made their way through the corridor.

2. Apparently, at some point in the conversation, Trayer offered as identification his money clip, which carried the initials "WT."

3. Officer Buss and Ben II had withdrawn to the end of the corridor, and at no time entered Trayer's roomette.

4. The cocaine found in Trayer's briefcase has a street value of approximately $28,000. Also found in Trayer's briefcase were several plane and airline tickets indicating numerous recent trips between Miami and Philadelphia. Trayer's passport indicated a trip to Jamaica, although the date of the trip is unclear.

Amendment rights in searching his roomette without probable or reasonable cause, this Court holds that Trayer had a reduced expectation of privacy in his roomette, was not entitled to the protections of the probable cause standard under these circumstances, and that the officers in this case had sufficient reasonable suspicion to enter Trayer's roomette. In *United States v. Whitehead*, 849 F.2d 849 (4th Cir.1988), the Fourth Circuit has held, in a persuasive application of the law to facts very similar to these, that train passengers have a reduced expectation of privacy in their sleeping compartments. *Id.* at 855. The court in *Whitehead* rejected an attempt to analogize a train's sleeping compartment to a "home on wheels," and properly held that the public nature of the train environment, its close regulation by federal officials, the continuous oversight of sleeping car passengers by conductors and personnel, particularly when weighed against the long-established distinction in Fourth Amendment jurisprudence between fixed and mobile locations, *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), all work together to diminish a passenger's expectation of privacy. *Whitehead*, 849 F.2d at 853–55. The *Whitehead* court considered this reduced expectation of privacy in light of the minimal intrusiveness of a dog search, *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), and the gravity of the law enforcement interest in thwarting the flow of drug traffic, and found that the use of a dog sniff in the sleeping car satisfied the Fourth Amendment's "reasonableness" standard under the circumstances of that case. The *Whitehead* court did conclude, however, that a train passenger does enjoy some expectation of privacy, however minimal, and that a "reasonable suspicion" standard is therefore appropriate in determining whether a dog sniff may be conducted in a roomette.

This Court agrees with the Fourth Circuit's conclusion in *Whitehead* that a train passenger has only a limited expectation of privacy, and agrees with its holding that reasonable suspicion is sufficient to permit a dog sniff inside a train compartment.[5] The issue here is slightly different, however, in that the officers did not conduct a dog sniff of Trayer's roomette. Instead, the officers proceeded to search the roomette themselves following Ben II's alert. Under the *Whitehead* analysis, then, the question is whether a reasonable suspicion of narcotics possession will permit, in addition to a dog sniff, the type of search that the officers conducted here. Put slightly differently, the issue is whether the Fourth Amendment's "reasonableness" requirement will permit, in addition to a dog sniff, the type of search that was here conducted when officers have a reasonable suspicion that narcotics are being held in a train roomette.

■ The Court holds that it does. Trayer's reduced expectation of privacy in his train roomette, coupled with the exigencies of the situation and the substantiality of the Government's interest, combine to permit a search of the type conducted here upon a reasonable suspicion of narcotics possession.[6] The Court further finds that, under the circumstances of this case, the officers—at the very least—had a reasonable suspicion that Trayer's roomette contained narcotics sufficient to justify the search that occurred. Cases in this jurisdiction make clear that once Ben II alerted outside Trayer's roomette, the officers enjoyed, not merely a reasonable suspicion,

---

**5.** *See also United States v. Liberto*, 660 F.Supp. 889 (D.D.C.1987) (Oberdorfer, J.), *aff'd*, 838 F.2d 571 (D.C.Cir.1988) (passengers in train sleeper compartments enjoy reduced expectation of privacy; entry into compartment without warrant after dog alerted to existence of drugs inside not in violation of Fourth Amendment).

**6.** With respect to the intrusiveness of the search conducted here, and its impact upon the "reasonableness" of the search under the Fourth Amendment, it is worth noting that only Officer Suave entered the roomette and that he located the briefcase within, at most, 10 seconds of entering the roomette. He immediately left the roomette, taking only the briefcase with him. No one else entered the roomette until Trayer had been placed under arrest. The facts of the search are important here; obviously, a reasonable suspicion standard will not justify all searches. The holding here is limited to the facts of this case.

but probable cause to search the interior.[7] *See United States v. Fulero*, 498 F.2d 748 (D.C.Cir.1974) (narcotics dog alert establishes probable cause to search luggage); *United States v. Carrasquillo*, 670 F.Supp. 49 (D.D.C.1987) (narcotics dog alert to luggage on train platform establishes probable cause to search and arrest owner); *United States v. Liberto*, 660 F.Supp. 889 (D.D.C. 1987) (narcotics dog alert establishes probable cause to search luggage in Amtrak roomette); *United States v. Watson*, 551 F.Supp. 1123 (D.D.C.1982) (narcotics dog alert to letter justifies opening of letter).[8]

Trayer seeks to avoid this result by challenging the manner in which Officer Buss handled Ben II's investigation on the train. Relying on the testimony of a purported "expert" in narcotics dog training and handling,[9] Trayer offers two arguments, one irrelevant and the other incredible. First, Trayer's "expert" alleges that Officer Buss should have permitted Ben II into the compartment along with Officer Suave. Trayer's "expert" asserts that this would have permitted Ben II to "define" the scope of the search, and would have ensured that Ben II's alert outside the roomette was not due to the residue of some other narcotic

that had been in the roomette at some earlier time. However, this purported error is utterly irrelevant to the question of whether the officers had reasonable suspicion to search the roomette in the first place. The issue is whether, standing *outside* Trayer's compartment, the officers were justified in their decision to search. The circumstances presented make clear that, based upon Ben II's alert and the other information available to the officers *before* they entered, the officers had probable cause to search the compartment. *See Liberto*, 660 F.Supp. at 891 ("once [the narcotics dog] had 'alerted' to the narcotics in the defendant's suitcase, it can not be denied that the officers had probable cause to believe that the luggage contained illicit drugs."). The assertion of Trayer's "expert" that Officer Buss erred in not permitting Ben II into the compartment *after* the decision to search was made (and the Court is not persuaded that Officer Buss did err) means nothing here.

■ Trayer's "expert" also alleges that it was inappropriate for Officer Buss to know, prior to entering the train, which roomette was under suspicion. According

7. This decision, of course, does not suggest which indicia, *short* of a dog alert and the drug courier criteria Trayer satisfied, will provide reasonable suspicion under these circumstances to justify the type of roomette search that occurred. In this case, absent Ben II's alert, it is very doubtful that the officers, based solely upon the drug courier profile information, had a reasonable suspicion which would have permitted the search.

8. Trayer seeks to distinguish these cases on the grounds that, in each, the article containing the narcotics was in the dog's plain view. In each case, the dog had direct access to the article itself and alerted directly to the article. Trayer points out that here, the alert upon which Officer Suave based his entry was not to Trayer's briefcase, but was instead to Trayer's roomette. The point of this distinction appears to be that because Ben II did not first alert directly to the briefcase, but may instead have been alerting *to* the residue of drugs that may have been in the roomette at some earlier time, the existence of probable cause or reasonable suspicion was diminished. The Court finds the distinction unpersuasive. In each of the above-cited cases, the dog alerted to the existence of narcotics in a confined space or unit, which provided probable cause to search that space or unit. Here, Ben II alerted to the existence of drugs inside

Trayer's roomette. Like the luggage in the other cases, the dog's behavior therefore defined a specific space or unit—the roomette—within which the officers enjoyed probable cause (and in light of the analysis above, reasonable suspicion) to search, a search which turned up Trayer's briefcase. Trayer's attempted distinction is thus more spatial than legal. With respect to the possibility of Ben II's alerting to drugs no longer in the roomette, this possibility also exists with respect to the luggage at issue in the cited cases, although perhaps to a lesser degree. Moreover, it is worth noting that Ben II passed the other roomettes in the car without alerting; if Ben II were inclined to alert to no-longer extant drugs, it would seem that he would have been just as likely to do so with respect to the other cabins as with respect to Trayer's roomette alone.

9. Trayer offered as a supposed expert Mr. Thomas Knott, a retired member of the Baltimore police department who claims to have supervised the training and handling of Baltimore's canine narcotics force from 1970 to 1986. Mr. Knott also claims to have participated in the training of narcotics dogs for the Army and Navy, among others.

to Trayer's "expert," it is possible that a handler's subtle voice or physical cues, potentially conveyed to the dog in the course of an investigation, may in certain situations distort a dog's objectivity. However, upon questioning, the "expert" conceded that he lacked any evidence whatsoever that Officer Buss had actually conveyed any inappropriate cues to Ben II in the course of the investigation aboard train 88/98. Under these circumstances, the Court refuses to credit the testimony of a paid professional witness as to an issue that is at best speculative and conjectural. Absent more compelling evidence than the conjecture of Trayer's "expert," this court rejects the suggestion that Officer Buss may or might have influenced Ben II in any way aboard the train when there has been offered not a scintilla of evidence to suggest that such influence occurred in this case.

■ Trayer's second argument as to the propriety of his search and detention is that the officers effectively placed him under arrest in his roomette without probable cause.[10] According to Trayer, during the search of his roomette he "was not free to leave and was under arrest under the teachings of *Florida v. Royer*, 460 U.S. 491 [103 S.Ct. 1319, 75 L.Ed.2d 229] (1983)." This argument is without merit. As the cases from this jurisdiction cited above indicate, once a trained narcotics dog "alerts" to the existence of drugs, probable cause exists to search the defendant and the belongings alerted to. There is no reason to hold that this probable cause to search did not, under the circumstances presented here, also constitute probable cause to seize Trayer. *See* Kamisar, LaFave & Israel, *Modern Criminal Procedure* 279 (6th ed. 1986) ("It is generally assumed that the same quantum of evidence is required whether one is concerned with probable cause to arrest or probable cause to search.").[11] Accordingly, the officers here had probable cause to arrest Trayer, the sole occupant of the roomette, once Ben II alerted outside Trayer's roomette, insofar as they had probable cause to search Trayer's compartment at that point. Where, as here, possession of cocaine is itself a criminal offense, and where there can be no reasonable inference other than that Trayer was in possession of the contents of his roomette, the fact that Ben II alerted to the existence of cocaine in Trayer's roomette provided probable cause for Trayer's involuntary detention. This probable cause to arrest was further confirmed when Ben II later alerted specifically to Trayer's briefcase. The fact that the officers did not formally arrest Trayer in his roomette is irrelevant; they had probable cause to do so, and the officers' actions did not violate Trayer's Fourth Amendment rights. *See United States v. Thornton*, 733 F.2d 121, 128 n. 9 (D.C.Cir.1984) (affirming arrest after search where probable cause to arrest existed prior to search).

■ Moreover, even assuming that the officers lacked probable cause to place Trayer under effective arrest in the roomette, Trayer has offered insufficient evidence to support his claim that, in fact, he was not free to go and therefore was under arrest. The evidence adduced at the hearing establishes only that the officers knocked on Trayer's door and asked several questions. Trayer has offered nothing to suggest that the officers made clear that he could not leave, or that he reasonably believed that he could not leave.[12] Moreover, at the time of the search, the officers had, for the reasons elaborated upon above,

---

10. At the hearing on this matter, Trayer's counsel did not press these latter two positions, but appeared to concentrate exclusively upon the argument that the officers lacked probable cause to search Trayer's roomette. However, the Court addresses these issues insofar as they were raised in Trayer's motion to suppress.

11. At the hearing, Trayer's counsel also conceded that probable cause to search typically also provides probable cause to arrest.

12. The uncontested testimony of Officer Cassidy at Trayer's preliminary hearing, stipulated to by counsel in this proceeding, shows that Trayer was not ordered to accompany the officers from the train when his briefcase was removed, but rather, apparently voluntarily, "followed the briefcase." Cassidy Tr. at 23.

at the very least "specific articulable facts which, taken together with rational inferences from those facts," reasonably warranted a temporary detention. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). The officers were therefore entitled, if not to arrest Trayer, to detain him and his luggage temporarily until the officers had allayed their reasonable suspicions. The manner of detention here, prior to Ben II's second alert to the briefcase, can hardly be characterized as unreasonable, or beyond that permitted by *Terry. See Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (valid *Terry* stop "must be temporary and last no longer than necessary to effectuate the purpose of the stop."). *See also United States v. Tavolacci,* No. 88–238, —— F.Supp. —— (D.D.C. August 22, 1988) (Hogan, J.) (valid *Terry* stop where defendant and luggage ordered from train for search; court "wary of setting bright-line procedures by which the drug interdiction unit must operate. The nature of the work that the unit performs requires a large degree of flexibility in investigating drug trafficking.").

 Finally, Trayer contends that the search warrant which permitted the search of his briefcase was improperly issued because Ben II was "not sufficiently reliable for a finding of probable cause." In *United States v. Watson,* 551 F.Supp. 1123 (D.D.C.1982), Judge Jackson of this court faced a similar challenge to a warrant issued in reliance upon a narcotics dog, and responded as follows:

> While canine-conducted narcotics searches may have encountered some judicial skepticism in the past, the technique is now sufficiently well-established to make a formal recitation of a police dog's *curriculum vitae* unnecessary in the context of ordinary warrant applications.

*Id.* at 1127. The court agrees with Judge Jackson, and holds that the warrant in this case was properly issued in reliance upon

all of the facts presented to the magistrate, including the central facts that Ben II is a trained narcotics dog and that he had alerted to Trayer's briefcase.[13] This information established probable cause sufficient to justify issuance of the warrant in this case. Trayer's *post hoc* challenges to Ben II's reliability and qualifications do not undermine the validity of that warrant.

For the foregoing reasons, Trayer's motion to suppress the quantity of cocaine taken from his briefcase, which had been taken from his Amtrak roomette, will be denied. An order shall issue of even date herewith.

---

13. The affidavit of Officer Buss in support of the warrant included a reference to the fact that drugs had been found in approximately 95% of the situations in which Ben II had alerted to their existence.