132 F.3d 41
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Margaret Denise HUGHES, aka Margaret Brown, Defendant-Appellant.
 No. 96-10279.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Aug. 6, 1997.
Decided Dec. 5, 1997.
 
 Appeal from the United States District Court for the Eastern District of California. Lawrence K. Karlton, Chief District Judge Emeritus, Presiding.
 Before: SNEED, FLETCHER and REINHARDT, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Margaret Denise Hughes pled guilty to possessing cocaine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1), but reserved the right to appeal the district court's denial of her pretrial motion to suppress. Because the district court erred in its application of the Fourth Amendment, we reverse.
 
 
 3
 After stepping of a train heading from Los Angeles to Seattle at a scheduled 30 minute station stop in Sacramento to smoke a cigarette, Hughes was approached by three agents from the Drug Enforcement Agency. Following some initial questioning, the agents asked Hughes for her ticket and identification. When she returned to her compartment on the train to retrieve them, the agents followed and waited in the corridor.
 
 
 4
 While on the train, the agents first asked if they could search Hughes' luggage and then asked if they could have a dog sniff the luggage. Hughes did not consent to either request. Nevertheless, the agents told Hughes that they were going to perform the dog sniff. They took her luggage from the train and lined it up on the platform. The agents told Hughes that if the dog did not alert that they would return the luggage to her, but that if the dog did alert that they would retain it. They invited her to stand by during the dog sniff, but told her that if she preferred they would give her a receipt for the luggage.
 
 
 5
 Hughes opted to stay, and, during the dog sniff, the dog alerted on a small multi-colored bag. The agent then stated that he intended to search the bag.[1] Hughes said that she would empty it for him and began to remove the contents. But, the agent reasserted that he would search it himself and he proceeded to empty the bag on the platform, ultimately finding three grams of cocaine in a cosmetics case.[2]
 
 
 6
 This court has long held that in order to conduct a warrantless search of a closed container that is not incident to an arrest, there must be not only probable cause but exigent circumstances. See United States v. Johnston, 497 F.2d 397, 398-99 (9th Cir.1974). Here, the district court summarily asserted that "the agents were excused from the ordinary requisite of a warrant by virtue of the exigent circumstances."[3] The court did not specify what those circumstances were, but rather simply cited to three cases where the court had found exigency due to the imminent departure of a train. However, none of these cases adequately supports the district court's ruling in the instant case.
 
 
 7
 In both United States v. Trayer, 898 F.2d 805, 808 n. 1 (D.C.Cir.1990), and United States v. Tartaglia, 864 F.2d 837, 840 (D.C.Cir.1989), narcotics officers were conducting dog sniffs of entire train compartments. Because the train in each case was about to leave, the courts held that the warrantless search of the compartment was allowable due to exigent circumstances. Clearly, compartments cannot as a practical matter be separated from the rest of the train and detained while a warrant is sought. Here, the luggage was easy to isolate and in fact was already off of the train.
 
 
 8
 In the third case, United States v. Johnston, 497 F.2d 397 (9th Cir.1974), a dog alerted to luggage on a train that was due to leave in three minutes. This is closer to our case but there is still an important difference. As with the other two cases cited by the district court, in Johnston, the luggage was still on the train. Moreover, the court in that case seemed especially concerned with the possibility of Johnston "discharging" the luggage and himself departing the train before the train reached its destination.
 
 
 9
 By contrast, in the instant case, all of the luggage was already off the train. Thus, there was no chance that any drugs in the luggage would be transferred or disposed of before the agents could obtain a warrant and search it. Even before conducting the dog sniff, the agents made it clear that the luggage would not be going back on the train if the dog alerted. Hughes had the choice of standing by or getting a receipt and continuing on without her luggage. Nothing prevented the agents from delaying the search in order to obtain a warrant after the dog alerted to the multi-colored bag.
 
 
 10
 Because no exigent circumstances justified the warrantless search of the multi-colored bag, the district court erred in denying Hughes' pretrial motion to suppress. All of the cocaine subsequently found by the agents was fruit of the poisonous tree, and not admissible under any of the exceptions to that doctrine, see United States v. Ramirez-Sandoval, 872 F.2d 1392, 1400 (9th Cir.1939), and thus should have been suppressed.[4]
 
 
 11
 REVERSED.
 
 SNEED, Circuit Judge, Dissenting:
 
 12
 The majority opinion holds that under the facts of this case there was no consent to search tie handbag in which illicit drugs were found nor was the search conducted under exigent circumstances justifying the absence of the warrant. Because of these conclusions, the inventory search of the luggage constituted the "fruit of a poisonous tree." The district court, on the other hand, held that there was no consent to search the handbag, but that exigent circumstances excused its warrantless search.
 
 
 13
 I would hold that there was consent to the search of the handbag. Were I concerned, which I am not, that no consent was given, I would find the district court's position on exigent circumstances worthy of discussion. I would also uphold the warrantless search of the rest of Hughes' luggage under the doctrine of inevitable discovery. See Nix v. Williams, 467 U.S. 431, 444 (1984). Regardless of the propriety of the agents' inventory search, the cocaine would have been discovered by the Sacramento police pursuant to their own inventory search.
 
 
 14
 This diversity of opinion suggests the fable of the four blind men, each of which felt a different part of the anatomy of an elephant--one the trunk, another the tail, another the leg, and the last the ear. Each believed that he had felt something different. Properly admonished by this story, I shall set forth the facts in more detail than has the majority.[1]
 
 I.
 FACTS
 
 15
 On February 7, 1995, an Amtrak employee, and sometime informant to the Drug Enforcement Agency (DEA), relayed the following information to the DEA about an Amtrak passenger: (1) the passenger's ticket was for one-way travel from Los Angeles to Seattle; (2) the ticket included a berth in a sleeper car; (3) the passenger paid for the ticket in cash and only twenty minutes prior to departure; and (4) the telephone number given by the passenger was disconnected. The train was scheduled to stop in Sacramento at 12:00 A.M. for 30 minutes. Three DEA agents, Smith, Collett, and Hudon arrived at the Sacramento Amtrak station at 11:00 P.M., where they met Roseville Police officer Gruelle, a K-9 officer, and his dog Rico.
 
 
 16
 When the train arrived at 12:45 A.M., agents Collett and Smith identified the defendant's sleeper car. The defendant, an African-American woman, exited the train to smoke a cigarette. DEA agents Smith and Collett, both of whom were white males dressed in street clothes, approached the defendant, identified themselves as police officers, and asked her if she minded speaking to them. The agents concealed their weapons at all times. The defendant answered "sure, no problem; am I under arrest?" The agents explained that she was not. When asked for her name, the defendant replied "Margaret Brown."[2] After the agents asked for her train ticket, Hughes produced a train reservation bearing the name "Clywone Williams." The agents then asked Hughes if she would consent to a search of her luggage. She questioned whether she had done anything illegal. After answering in the negative, the agents did not immediately resume their attempt to gain Hughes' consent.[3] Instead, the agents asked her to explain why she was travelling under a different name than was on her reservation. After receiving an explanation that the agents found "suspicious," agent Collett stated that he would need to see some identification. Hughes agreed to take the agents to her compartment to retrieve her identification. The agents stood outside Hughes' compartment. Hughes handed the agents a California drivers' license bearing the name "Margaret Ann Brown" with a San Francisco address. The agents promptly returned the drivers' license to her. Hughes then gave the agents her business card which showed that she owned a business in Atlanta. The agents again asked Hughes if she would consent to a dog sniff of her luggage. At this point, it is best to refer specifically to the record:
 
 
 17
 Q: And what was her response?
 
 
 18
 A: She again asked if she was under arrest and that didn't we need a search warrant to look into her bags.
 
 
 19
 Q: And what was her response?
 
 
 20
 A: The response was that at that point I made the determination that from what we had questioned her and knew about the case, I decided that at that point to detain her luggage.
 
 
 21
 Q: Did you respond directly to the question of whether she was under arrest at that time?
 
 
 22
 A: Yes. I told her that she wasn't under arrest, that she was free to leave. And I further went on to explain exactly how we were going--how I was going to handle this situation in detaining her luggage.
 
 
 23
 Q: What did you tell her?
 
 
 24
 A: I told her that I was going to--we were going to gather her luggage up, that I was going to take her luggage to the outside--just outside the train and allow a drug dog to sniff her luggage.
 
 
 25
 Depending on what happened out of that drug sniff, I would provide a receipt for her or I would return her luggage back to her depending on how--if the dog did not alert to any of the bags, I would return all the luggage back to her and she would be back on the train, she would be back on her travels.
 
 
 26
 I explained to her that if I did end up taking any of her luggage, if I did get a positive alert, that I would give her a receipt for those pieces of luggage that I would take.
 
 
 27
 She agreed that she wanted a receipt for those pieces of luggage if I were to take them. And I additionally added, I told her that--when I told her that she was not under arrest and explained the procedure of what I was going to do, I asked her--or I told her she was free to accompany us outside and to watch what we were going to do with her luggage.
 
 
 28
 Q: And--
 
 
 29
 A: She wanted to come out and watch what we were going to do.
 
 
 30
 Q: So what did you do then?
 
 
 31
 A: At that point I told her to--and during that time, Agent Collette [sic] asked whether there was an address or a telephone number that she could provide so that just in case we did take--we were going to take any of her luggage, that we would return it back to her. She said that was not possible.
 
 
 32
 At that point I directed her to gather her luggage up and that we would exit the train.[4]
 
 
 33
 Hughes, Collett and Smith stepped off the train, and were met by agent Hudon, officer Gruelle and his dog Rico. After the agents placed Hughes' luggage on the platform, Rico passed over each piece of luggage and positively alerted to a small multi-colored handbag. Agent Smith asked Hughes what the handbag contained. She replied, in an excited manner, that there was nothing in her bag, not even aspirin. Once again, I will refer specifically to the record:
 
 
 34
 Q: What did you say next?
 
 
 35
 A: I asked her for her consent to look into that bag.
 
 
 36
 Q: What did she say?
 
 
 37
 A: She gave it to me. She said, "No problem."
 
 
 38
 Q: What were her exact words to the best of your recollection?
 
 
 39
 A: She said that would be all right.
 
 
 40
 Q: What was she doing as she was saying this?
 
 
 41
 A: She was in the process--I was in the process of kneeling clown toward the bag. As she told me it was all right to look into the bag, she was already in the process of walking over to that bag. And at that time when she gave me permission to look into the bag, she began to empty the bag, the contents of the bag onto the platform. I stopped her and explained that I would conduct the search and then she backed off.[5]
 
 
 42
 Agent Smith discovered a plastic baggie of cocaine, wrapped in tissue paper, located inside a cosmetic case. Arrangements were made to turn Hughes over to the Sacramento police. Thereafter, the agents conducted an inventory search of the rest of Hughes' luggage at the train station. They discovered several kilograms of cocaine. Hughes was promptly read her rights and arrested.
 
 II
 CONSENT
 
 43
 The district court held that Hughes' consent was involuntary based on its conclusion that she yielded to the agents' assertion of lawful authority and was coerced into giving her consent.[6] Notwithstanding the deferential nature of our review, see United States v. George, 987 F.2d 1428, 1431 (9th Cir.1993), I must conclude that Hughes' consent was voluntary.
 
 
 44
 The government must demonstrate that the defendant's consent was voluntary based upon the totality of the circumstances. United States v. Spires, 3 F.3d 1234, 1237 (9th Cir.1993). "Mere acquiescence to lawful authority is insufficient." Id. Some of the factors to be weighed include: (l) whether the person was in custody; (2) whether the agents had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was told that she had the right not to consent; (5) whether she was told a search warrant could be obtained; and (6) the defendant's belief as to the likelihood that contraband will be discovered. Id.
 
 
 45
 Here, the government overwhelmingly met its burden of showing that Hughes' consent was freely given. First, Hughes was not in custody. The agents returned Hughes' drivers' license to her, told her that she could stay on the train, and explained that she would be provided a receipt in the event her luggage was detained. Thus, Hughes was free to continue her journey. Second, no guns or other signs of force were used during the agents' brief confrontation with Hughes. Third, inasmuch as Hughes was not in custody, Miranda warnings were not necessary. See United States v. Kim, 25 F.3d 1426, 1432 (9th Cir.1994). Fourth, the agents never claimed that a search warrant was readily obtainable. See Id. Fifth, inasmuch as Hughes owned a business in Atlanta, resided in San Francisco, and visited friends in Los Angeles and Seattle, she was hardly lacking in sophistication. See Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973) (factors to be considered in determining consent include the defendant's age, education, and intelligence). Sixth, although Hughes was African-American and female, while all of the agents were apparently white males, such factors are in no way dispositive. See United States v. Mendenhall, 446 U.S. 544, 558 (1980). Seventh, due to the cocaine's hidden location, Hughes may have considered its discovery unlikely. Finally, although the agents never told Hughes that she had a right not to consent, they did provide her with a choice: take a receipt and continue her journey or consent to a search. It cannot be said, therefore, that Hughes was coerced into giving her consent in order to continue her journey. After reviewing the totality of the circumstances, I am compelled to conclude that the government met its burden of proving that Hughes voluntarily consented to the search of her handbag. See Spires, 3 F.3d at 1237; cf. United States v. Chan-Jimenez, 125 F.3d 1324, 1327-28 (9th Cir.1997) (holding consent involuntary where defendant was seized on a desert highway with no one around, officer placed hand on gun during request for consent, and defendant gave no verbal response). Moreover, given that Hughes was a sophisticated businessperson and traveler who was offered a choice cf options, the cases holding that a defendant's consent was mere acquiescence to lawful authority are inapposite. See e.g., Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968) (holding that consent was acquiescence to lawful authority where elderly African-American woman in isolated, rural area allowed officers to search home after they claimed to have a warrant); LaDuke v. Nelson, 762 F.2d 1318, 1329 (9th Cir.1985) (holding that consent by Mexican farmworkers was mere acquiescence to lawful authority where search was accompanied by a substantial show of force by INS agents), modified, 796 F.2d 309 (1986).
 
 
 46
 I would affirm the judgment of the district court.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 This was the factual finding of the district court, ER 250, notwithstanding the testimony of DEA agent Edward E. Smith, which the dissent would find dispositive
 
 
 [2]
 The dissent would weigh the facts differently than did the district court in its determination that Hughes did not consent to the search of her luggage. However, a district court's determination of whether a defendant voluntarily consented to a search is a question of fact reviewed under the clearly erroneous standard. See United States v. Sparks, 87 F.3d 276, 278 (9th Cir.1996). Consent is evaluated by the district court under the totality of the circumstances to determine if it was freely and voluntarily given; the burden is on the government to demonstrate that the consent was valid. See Schneckcloth v. Bustamonte, 412 U.S. 218, 227-29 (1973)
 In this case, the district court specifically found "from an examination of all the circumstances that ... the defendant's conduct is best explained as submission to an assertion of lawful authority. Each of the factors relied upon by the defendant in her argument suggests either her vulnerability under the circumstances or subtly coercive conduct on the part of law enforcement." ER 269. The district court found factual support for this conclusion in "defendant's race, gender, the number of officers, their racial composition, the fact that the confrontation disrupted a journey in an apparently unfamiliar city, [and] the threat of separation from her luggage." ER 270 n. 3. Moreover, we note that the incident occurred in the middle of the night, ER 13, and that, after repeatedly declining to consent to a search of her luggage, the agents never told Hughes that she had the right to prevent them from searching her bag. See United States v. Mendenhall, 446 U.S. 544, 558-59 (1980). Finally. although the dissent speculates that "due to the cocaine's hidden location, Hughes may have considered its discovery unlikely," there is no support in the record for this speculation.
 Thus, under the totality of the circumstances, we cannot say that the district court committed clear error in determining that the government did not meet its burden of proving that Hughes voluntarily consented to any search
 
 
 [3]
 The district court also found that the dog's alert to the multi-colored bag, combined with the earlier reasonable, articulable suspicion, constituted probable cause. Because we need not reach that issue, this memorandum expresses no opinion as to whether the agents lacked probable cause
 
 
 [4]
 After finding the three grams of cocaine, the DEA agents arrested Hughes and were preparing to turn her over to local authorities. However, before the local authorities arrived, the agents decided to conduct an "inventory search" of the rest of Hughes' luggage. Although the dog had not alerted to any of the other suitcases, the agents discovered that one of them contained several kilos of cocaine. The agents then decided to keep Hughes in federal custody and, after obtaining a search warrant, found a total of fifteen kilos. This search appears improper under Illinois v. Lafayette, 462 U.S. 640, 644-48 (1983), because it was performed at the train station after the agents had already decided to turn Hughes over to the local authorities. However, we need not reach the issue of whether the cocaine should also have been suppressed as a result of an unlawful inventory search because all of the cocaine was fruit of the earlier unconstitutional search of the multi-colored bag
 
 
 [1]
 For a brief moment the author of this dissent thought his recollection of a fable he first encountered as a child would be both an apt and an original use in legal literature. His clerk quickly disabused him of a portion of this conceit. The fable, in one form or another, has been cited in law review articles over a hundred times since 1987. Properly chastened, I insist that it remains appropriate under the circumstances of this case. For more see Pierre Schlag, Hiding The Ball, 71 N.Y.U L.Rev. 1681 (1996)
 
 
 [2]
 Because the case caption reads "Margaret Denise Hughes a/k/a Margaret Denise Brown," I refer to the defendant as "Hughes."
 
 
 [3]
 This fact contradicts the district court's factual finding that the agents: (1) were not "deflected" from their course of conduct; and (2) "conducted themselves as if [Hughes'] consent was superfluous."
 
 
 [4]
 Hughes' attorneys' Memorandum of Points and Authorities creatively obfuscated these important facts. For example, Hughes' memorandum argued that the agents' actions were coercive because "no arrangements had been made to return her bags to her" and because the agents failed to give Hughes a receipt "before the agents removed the bags to the platform." The district court was apparently misled into accepting this view as evidenced by the court's explicit acceptance of Hughes' Memorandum of Points and Authorities in its Amended Order
 
 
 [5]
 The district court specifically found that Agent Smith "announced his intention to search the bag." Upon my review of the record, however, I am unable to locate any support for the district court's view. In addition to Agent Smith, both Agent Collett and Amtrak Assistant Conductor Barker testified that Hughes was asked whether she would consent to a search of her bag. The district court's finding is best explained as a reflection of its stated beliefs on the subject of consent. The district court posited its views as follows:
 I mean, this whole business of consent is, you know, it 's a wig, right? We call it consensual. We really know what we're doing. We're exerting our authority, right?
 * * *
 And I will find that once the officers had the alert, that was the impetuous [sic]--going to say--that was the impetuous [sic] to their search and her consent was irrelevant thereto. They would have searched in any event.
 Given the district court's acknowledged bent, it is hardly surprising that it ultimately found that Hughes' consent was not voluntarily. As explained in part II of the dissent, I would hold this finding to be clearly erroneous.
 
 
 [6]
 The district court relied on "the defendant's race, gender, the number of officers, their racial composition, the fact that the confrontation disrupted a journey in an apparently unfamiliar city, [and] the threat of separation from her luggage."