Jose GUADALUPE, Appellant,

v.

UNITED STATES, Appellee.

No. 89–793.

District of Columbia Court of Appeals.

Argued June 4, 1990.
Decided Jan. 31, 1991.

Dennis C. Galarowicz, appointed by this court, for appellant.

Brenda J. Johnson, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman and Daniel M. Zachem, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and NEWMAN and BELSON, Associate Judges.

ROGERS, Chief Judge:

Appellant Jose M. Guadalupe, Jr. appeals from his conviction of possession of cocaine with intent to distribute in violation of D.C. Code § 33–541(a)(1) (1989), on the ground that the drugs were obtained by an unconstitutional search and seizure. The trial judge denied appellant's motion to suppress, concluding that the police had not violated appellant's Fourth Amendment rights during the course of two successive confrontations during a twenty-five to thirty minute period as appellant and a male companion were leaving Union Station after arriving on a train from New York City. The judge also found that appellant had voluntarily consented to the body search. We hold as a matter of law that appellant, as a reasonable person, who was subjected to random successive confrontations by narcotics officers involving increasingly intrusive searches—the first confrontation involving requests for identification, an inquiry whether the suspect is carrying narcotics and a search of his bag in which the person cooperates fully and no drugs are found, and the second confrontation involving similar questions and a request for a body search immediately after an unproductive body search of his companion by one of the officers—would not have felt free to leave. Consequently, since the police lacked articulable suspicion under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the seizure of the drugs from appellant was unlawful, *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and the trial court erred in denying the motion to suppress.

I

On December 3, 1988, Sergeant John J. Brennan, in charge of the Metropolitan Police Department's drug interdiction unit and Pat Dunn, an agent of the Drug Enforcement Administration, were working a drug interdiction operation at Union Station, in Washington, D.C., in an effort to locate narcotics couriers who arrive from New York.[1] At approximately 6:30 p.m. Sergeant Brennan saw appellant leave a

1. As Sergeant Brennan explained at the suppression hearing, his job was to watch buses and trains coming in from narcotics-source cities and interview and arrest persons who are transporting such drugs. The unit's practice is to approach people who leave trains or buses, identify themselves, and ask if the people would converse with them and if so, conduct an interview, and from that interview ask for consent to search their property, their luggage, or their person. In responding to the question of how they select people to interview, Brennan testified that "[s]ometimes we just approach people, just approach different people, getting off source city buses or trains. Other times, we watch for activities such as people splitting up, people coming in, going right to the telephone, looking around the station in a suspicious manner, doing suspicious things." The members of the unit are not in uniform although they are armed with concealed weapons. Their badges also are concealed. In describing the manner in which he generally approaches people, Brennan also testified that only once or twice had anyone refused to respond to his initial questioning, and at that point, he stated, if they refuse, then "there is nothing you can do. People walk away." He also testified that when people walk away he makes no attempt to stop them.

southbound train that had just arrived from New York City.[2] Appellant walked toward the main concourse at Union Station while conversing with another man identified as Mr. Rivera. Nothing in particular drew Sergeant Brennan's attention to the men, and when Rivera walked away from appellant, the officers did not focus on him. However, a few minutes later Rivera joined appellant in the main concourse area and the two men started to walk off together. The officers decided to interview the men, and Agent Dunn approached Rivera. As he did, appellant stopped a few seconds and then slowly walked away. Sergeant Brennan approached appellant from the rear, showed his identification, and asked appellant if he would answer some questions. Appellant said "yes," and Sergeant Brennan proceeded to ask appellant six questions. As he did, he stood off to the side of appellant, Sergeant Brennan explained, so as not to interfere with his freedom of movement. The sergeant was in plainclothes, his weapon concealed, and at all times spoke in a conversational tone and courteous manner, and did not command appellant or touch him.

Sergeant Brennan first asked appellant if he was traveling on a train, and appellant said he was. Second, the sergeant asked if he had a train ticket and appellant handed him a ticket for travel from New York City to Washington, D.C. Third, after returning the ticket to appellant, Sergeant Brennan asked appellant if he had identification and appellant gave him a receipt or pay slip with his name on it. Upon looking it over, Sergeant Brennan returned it to appellant. Fourth, Sergeant Brennan asked appellant where he was going, where he was visiting. Appellant said he was "here to let loose with Mr. Rivera" and they were going to "Rivera's cousins, or something like that." [3] Fifth, Sergeant Brennan asked appellant if he was carrying any narcotics in his bag, and he said no.[4] Sixth, Sergeant Brennan asked appellant if he could search the bag, and appellant handed it to him. After conducting a thorough search of the bag and finding no narcotics, Sergeant Brennan repacked the bag and gave it back to appellant, thanking appellant for his cooperation. Appellant then asked the sergeant where Rivera was. Sergeant Brennan said he did not know, and he and appellant walked together for a few feet until Sergeant Brennan noticed that Rivera was on the fast food level below the concourse. Appellant thanked Sergeant Brennan and walked away.

Sergeant Brennan and Agent Dunn then conferred about their two interviews and decided that some of the information did not seem right to them and, because they were suspicious of appellant and Rivera,[5]

2. Sergeant Brennan thought it was the Virginian, which makes stops in 8 or 9 locations between New York City and Washington, D.C. Brennan refers to any southbound train passing through or originating in New York City as a New York train. He explained that "the drug problems in the District of Columbia is being supplied mainly by persons from New York City."

3. At this point, Sergeant Brennan testified that he did not suspect appellant of a crime.

4. On cross examination, Sergeant Brennan said the question about having narcotics was the normal question that would follow the preliminary questions even though he did not suspect a person of any crime. He explained, however, that this question would probably not be asked of a college student who produced a student identification card. Further, Brennan stated that it was "always in the back of your mind that you suspect something, as a person, as a police officer. Because, as I said, New York City is the source city for narcotics." In addition, once appellant denied having drugs in the bag, Brennan testified that he had a particular suspicion about him.

5. Sergeant Brennan explained that he became suspicious when appellant walked off after Agent Dunn approached Rivera. Brennan testified that "this happens with drug couriers all the time. One person doesn't want to be involved in the other person's—either the person being interviewed is carrying the drugs, or the person walking away is carrying the drugs." Then when Brennan was interviewing appellant, Rivera walked by, looking at them, and when he went downstairs to the food line he nodded to appellant and went down and met up with him. "It just seemed like they were trying to disassociate themselves from each other, at that time. And then after the interviews were conducted, they came back together."

they decided to place them under surveillance while they were in Union Station. The officers went downstairs to the fast food area where appellant and Rivera were standing in a line for sandwiches; they stood about 50 to 75 feet away, watching appellant and Rivera. The two men, according to Sergeant Brennan, were "continuously scanning the area, looking behind them, looking all over the place, not conversing with each other, but kind of scanning everything." Sergeant Brennan did not think they saw him or Agent Dunn. "All of a sudden," according to Sergeant Brennan, appellant and Rivera "turned and walked out of the food line without purchasing anything." The men started walking in the direction of the officers and upon seeing Sergeant Brennan, Rivera walked up to him and asked where the cab area was. Sergeant Brennan asked if they were taking a cab, and Rivera said his cousin was picking him up at the cab stand, explaining he had previously made a telephone call when he first entered the station. Sergeant Brennan then directed Rivera to the cab stand "out front". Rivera rejoined appellant and they walked off together.

Sergeant Brennan and Agent Dunn conferred again and decided to see if the men went to the cab stand area; once outside, they noticed that the two men had separated, appellant standing by a large concrete pillar and Rivera walking up and down, hurriedly, in the cab stand area. Dunn decided to ask Rivera, who was wearing a big, heavy coat, if he could conduct a body search. The search of Rivera did not uncover any drugs. While Rivera was being searched, appellant glanced at the officers and then looked straight ahead. Sergeant Brennan then decided to ask appellant if he would consent to a body search.[6]

Sergeant Brennan walked over to appellant and asked appellant three questions: if he would talk to him, and appellant said yes; if he was carrying any narcotics on his person, and he said no; and if he could search appellant, and appellant nodded his head and said yes. Upon patting appellant down, Sergeant Brennan felt objects on both sides, and "looked at" his shirt and saw two packets, approximately eight ounces of cocaine hydrochloride, taped to his body.

The sequence of events between the officers and appellant and Rivera lasted about twenty-five to thirty minutes. About fifteen minutes elapsed between the search of appellant's bag and Sergeant Brennan's second confrontation of appellant when he was standing by the concrete pillar near the cab stand.

Appellant did not present any evidence.

In denying the motion to suppress the drugs, the trial judge noted that he had only the testimony of Sergeant Brennan and that nothing "suggest[ed] any Fourth Amendment impropriety in the approach and in the talking to and asking questions." Further, to the judge it did "not appear the officers exceeded their authority in conducting the procedures that led up to what is in question here, which is the consensual part of the exchange. The search."

The judge found, with regard to events prior to the search of appellant's bag, that:

[the] conversation and ... approach was [sic] conducted in a fashion that would not suggest ... that there was any touching, that there was an aura or command that [was] issued by Sgt. Brennan. That Sgt. Brennan, in any way, obstructed the movements of [appellant] or that he did anything expressly or implicitly geared to create an aura of intimidation that would obviate [appellant's] understanding of his rights to move on free from further discussion.

Rather, what appeared to be happening, as observations continued, was that [appellant] and Mr. Rivera were acting in a very suspicious fashion, at first getting on the food line after the initial interro-

---

6. Sergeant Brennan testified that he had not searched appellant's body when he searched his bag because at that time he had not suspected that appellant was carrying drugs on his body. It was only after watching appellant and Rivera in the food court that the officer became suspicious. Sergeant Brennan testified that he did not have any prior information about appellant (or Rivera) before that evening.

gation and the initial inquiry, I could say—I should say. And then, after apparently scanning the area further, moving on away from the food line, getting no food, one of the individuals approaching Sgt. Dunn [the judge meant Sergeant Brennan] and asking where the cab stand was. And [appellant] and Mr. Rivera moving towards the cab stand area, but again, alternatively associating and disassociating themselves from each other, depending on what was going on in relation to the two agents.

Rejecting defense counsel's arguments that a seizure had occurred at the point the officers decided to follow appellant and Rivera to the cab stand, the judge found that

> the confrontations with the two individuals, and with [appellant] in particular, were not characteristic of custodial interrogation, but rather that the initial confrontation, during which time Sgt. Brennan actually got permission to search the suitcase, and did, and that confrontation resulting in having the suitcase returned to [appellant], providing evidence to [appellant] that the police, and Sgt. [sic] Dunn, specifically, were prepared to conduct themselves in a fashion that was in keeping with the individual rights of the defendant. That exchange clearly demonstrated that Sgt. [sic] Dunn was prepared to act in a polite and non-intimating [sic] fashion, and therefore, when Sgt. Brennan—excuse me, when Sgt. Brennan then confronted [appellant] again, it would have appeared reasonably clear that he was prepared, once again, to ask a question, get a response, and to conduct himself in the same fashion.

The judge also ruled that the consent was voluntary. While curious about why a person would consent to a body search knowing that he had illegal drugs strapped to his body, the judge speculated that, notwithstanding what might be viewed as an intimidating atmosphere, appellant might have thought, having once escaped detection of the drugs, that, because of the manner in which the drugs were secreted, he would escape again. The judge concluded, however, that appellant "gambled. He gave consent that was free."

## II

The issue is one of first impression for this court: whether successive police-citizen confrontations over a twenty-five to thirty minute period resulting in a request to conduct a body search, following an unproductive bag search and a body search of one's companion by a second officer, creates such an intimidating atmosphere that a reasonable person would believe he or she was not free to leave.[7] Appellant contends that the nature and timing of certain questions, specifically, whether he was carrying narcotics in his bag, constituted an unreasonable search, and that the officer's second confrontation with him constituted an illegal seizure, and that his consent to the body search was not voluntary. He further maintains that when the officer confronted him a second time, at the taxicab stand area, the chain of circumstances was such that he could not ignore the question and feel free to leave, having experienced two prior encounters with the two officers over a 25 minute period and having just seen one of the officers search Rivera, so that the successive confrontations converted what began as a police contact into a seizure.

■ The Fourth Amendment provides: The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

---

7. Our standard of review of the trial judge's determination whether appellant was seized is well settled. Although we defer to the trial judge's findings of fact unless clearly erroneous, "the ultimate determination as to whether a seizure occurred remains a question of law" reviewable de novo. *Michigan v. Chesternut,* 486 U.S. 567, 574–76, 108 S.Ct. 1975, 1979–81, 100 L.Ed.2d 565 (1988); *Florida v. Royer,* 460 U.S. 491, 501–07, 103 S.Ct. 1319, 1326–29, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877–78, 64 L.Ed.2d 497 (1980) (Stewart, J.); *Lawrence v. United States,* 566 A.2d 57, 60 (D.C.1989); *see also Richardson v. United States,* 520 A.2d 692, 696 (D.C.1987); *United States v. Gayden,* 492 A.2d 868, 872 (D.C. 1985).

Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

U.S. CONST. amend. IV. The Supreme Court has carved out a narrow exception to the warrant and probable cause requirements, permitting limited seizures of a person where the law enforcement officer has articulable suspicion that a person is engaged in criminal activity. *Terry v. Ohio, supra*, 392 U.S. 1, 88 S.Ct. 1868. In addition, the Court has defined a series of police-citizen contacts in which a person's Fourth Amendment rights are not implicated. In the interests of law enforcement, the Court has developed a test that focuses on whether or not the police-citizen confrontation is voluntary, and in determining whether it is, the focus is on whether a reasonable person, objectively defined, would feel free to leave the presence of the officer. The "test is necessarily imprecise, however, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Michigan v. Chesternut, supra* note 7, 486 U.S. at 573, 108 S.Ct. at 1979 (citing 3 W. LAFAVE, SEARCH AND SEIZURE § 9.2(h), at 407–08 (2d ed. 1987 & Supp.1989) (hereinafter LAFAVE)).

Thus, in *Mendenhall, supra* note 7, 446 U.S. 544, 100 S.Ct. 1870, a plurality of the Court held that the respondent had not been seized when two drug enforcement agents saw the respondent exit from a plane at the Detroit airport, and after concluding that her conduct fit the "drug carrier profile," confronted her on the public concourse, identified themselves as federal agents, asked to see her identification and airline ticket. *Id.* at 555, 100 S.Ct. at 1877. When her responses indicated that she had used an assumed name on her ticket and had only been in California for two days, one agent identified himself as a federal narcotics agent. The respondent became visibly shaken. After returning her ticket and driver's license to her, the agents asked respondent to accompany them to the airport office for further questioning.

*Id.* at 544, 100 S.Ct. at 1871. Once there, they requested permission to search her person and handbag, advising that she had a right to decline if she desired. She responded, "Go ahead." Justice Stewart, writing for a plurality, rejected the argument that the respondent had been seized while she was on the public concourse. *Id.* at 554, 100 S.Ct. at 1877. He wrote: a "seizure occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he [or she] was not free to leave." *Id.* Relying on "[t]he distinction between an intrusion amounting to a seizure and an encounter that intrudes upon no constitutionally protected interest," as illustrated by *Terry v. Ohio, supra*, 392 U.S. 1, 88 S.Ct. 1868, he noted that the Court "adhere[s] to the view that a person is 'seized' only when, by means of physical force or show of authority, his freedom of movement is restrained." *Id.* 446 U.S. at 554, 100 S.Ct. at 1877. "The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" *Id.* (quoting *United States v. Martinez–Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976)). Since the events occurred in a public concourse, the agents did not wear uniforms or display their weapons or summon the respondent to their presence or demand her airline ticket and identification, but merely requested it, Justice Stewart concluded that "nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way." *Id.* 446 U.S. at 555, 100 S.Ct. at 1878. Rather, he suggested that

[e]xamples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance

with the officer's request might be compelled.

*Id.* at 554, 100 S.Ct. at 1877. For Justice Powell, who concurred, the question whether respondent "reasonably could have thought she was free to 'walk away' when asked by two Government agents for her driver's license and ticket [was] extremely close," and he assumed that she had been seized. *Id.* at 560 & n. 1, 100 S.Ct. at 1880 & n. 1.[8]

Shortly thereafter, in another plurality opinion, the Court stated that the Fourth Amendment is not implicated if law enforcement officers approach an individual on the street or in another public place and ask a few questions:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions....
>
> Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification.

*Florida v. Royer, supra* note 7, 460 U.S. at 497, 103 S.Ct. at 1324.[9] Justice Brennan concurred in the result, concluding that it was unnecessary for the plurality to reach the issue of the legality of the officers' initial stop of Royer since the officers subsequent actions "clearly exceeded the permissible bounds of a *Terry* investigative stop. '[A]ny "exception" that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are "reasonable" only if based upon probable

cause.'" *Id.* at 509, 103 S.Ct. at 1330 (quoting *Dunaway v. New York,* 442 U.S. 200, 213, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979)).

The Supreme Court, adopting the test that Justice Stewart set forth in *Mendenhall, supra* note 7, has refused to establish bright line rules governing when a Fourth Amendment seizure occurs. *See, e.g., Michigan v. Chesternut, supra* note 7, 486 U.S. at 572, 108 S.Ct. at 1978 (refusing to decide whether all police chases are or are not seizures). Rather, the Court has adhered to its view that whether police conduct amounts to a seizure implicating the Fourth Amendment must be answered by taking into account " 'all the circumstances surrounding the incident.'" *Id.* (citing *Immigration & Naturalization Serv. v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984), and quoting *Mendenhall, supra* note 7, 446 U.S. at 554, 100 S.Ct. at 1877).

In examining the development of the law in this area, this court observed in *Barnes v. United States,* 496 A.2d 1040, 1044 (D.C. 1985), that the Supreme Court "has virtually deemed a police approach for questioning on the street to trigger a 'consensual encounter,' [*I.N.S. v.*] *Delgado,* [*supra,* 466 U.S. at 216, 104 S.Ct. at 1762], absent 'intimidating' circumstances beyond the natural sense of obligation almost anyone would feel when a police officer begins asking questions." *Id.* at 1044 (footnote omitted). The court suggested that the Supreme Court has apparently resolved the tension between the Fourth Amendment's right to be free from unreasonable searches and seizures and the public's interest in safety by "electing to raise the threshold of what is meant by a 'seizure,' rather than by deciding to lower the standard for the 'minimal level of objective

---

**8.** Justice Powell held that the agents "had reasonable suspicion the respondent was engaging in criminal activity, and, therefore, they did not violate the Fourth Amendment by stopping the respondent for routine questioning." *Id.* at 560, 100 S.Ct. at 1880.

**9.** Justice Powell, a member of the plurality concluding that Royer was under arrest and the surrender of his luggage could not be deemed

consensual, distinguished this case from *Mendenhall, supra* note 7, because Royer found himself, after the initial questioning and a request to go to a more private place, in a small, windowless room with two officers who, without his consent, had obtained possession of his checked luggage and had retained his drivers' license and airline ticket. *Id.* at 508–09, 103 S.Ct. at 1329–30.

justification [required] to validate the detention or seizure.' " *Id.* at 1044 (citing *I.N.S. v. Delgado, supra,* 466 U.S. at 217, 104 S.Ct. at 1763).[10]

The facts of the instant case do not fit neatly within the scenarios previously addressed by the Supreme Court. Sergeant Brennan did more than simply identify himself as a police officer and he asked for more than appellant's identification and ticket and he did not confine himself to a single confrontation with appellant or to a search of luggage or a body pat-down. In a series of decisions the U.S. Court of Appeals for the District of Columbia Circuit has held that drug interdiction operations involving some initial questioning and search requests in the course of a single confrontation by the police do not constitute a seizure or, alternatively, that the police had articulable suspicion to make a *Terry* stop; most of the single confrontations resulted in incomplete or unsatisfactory responses by the suspect, or a prior police investigation indicated that the person had some or all of the characteristics of a drug courier profile and the suspect became anxious or nervous or exhibited otherwise suspicious behavior in reaction to questioning.[11] Most recently the court re-

**10.** As suggested in *Lawrence, supra* note 7, 566 A.2d at 61, the test articulated by LaFave may best explain applicable law: "The critical factor is whether the policeman, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner which would be perceived as a nonoffensive contact if it occurred between two ordinary citizens" (quoting LaFave, *supra,* at 412). Others have suggested that the Court's decisions are virtually irreconcilable, Butterfoss, *Bright Line Seizures: The Need for Clarity in Determining when Fourth Amendment Activity Begins,* 79 J. Crim. L. & Criminology 437 (1988); Becton, *The Drug Courier Profile: "All Seems Infected that th' Infected Spy, as all Looks Yellow to the Jaundic'd Eye,"* 65 N.C.L.Rev. 417 (1987), or have offered an alternative analysis, Comment, *Reformulating Seizures—Airport Drug Stops and the Fourth Amendment,* 69 Calif.L.Rev. 1486 (1981) (3 factor test: (1) whether police conduct is investigatory, type of techniques, pressures to cooperate, (2) whether defendant was thereby caused to undertake significant, burdensome action, (3) whether it would be deemed offensive contact if initiated by a fellow private citizen, such as following a person after the person has indicated a disinclination to speak, or a physical touching by a total stranger, extensive questioning about personal matters).

**11.** *See, e.g., United States v. Maragh,* 282 U.S. App.D.C. 256, 894 F.2d 415 (1990) (Union Station; initial encounter and questioning by police held to be a consensual encounter that did not become a stop implicating the Fourth Amendment when police identified themselves as narcotics agents and asked if defendant was carrying narcotics); *United States v. Tavolacci,* 283 U.S.App.D.C. 1, 895 F.2d 1423 (1990) (train compartment; police conducted investigation of defendant prior to questioning him, at which point it was discovered that he was traveling under an assumed name and police thus had reasonable suspicion to support a *Terry* stop); *United States v. Winston,* 282 U.S.App.D.C. 96, 892 F.2d 112 (1989) (bus station; rejecting view that police must have articulable suspicion to

approach and question a person and that momentum of questioning and police maneuvers produced in terrorem effect when police asked to search defendant's totebag after the defendant denied possessing drugs); *United States v. Savage,* 281 U.S.App.D.C. 280, 889 F.2d 1113 (1989) (Union Station; police had prior information that defendant was a drug courier and interviewed him for 20 minutes in his roomette; held, consensual encounter since defendant free to leave and police had articulable suspicion when, during questioning, defendant's voice began to crack and he became uncomfortable when asked why he was using an assumed name and blurted out: "You got me. It's in there."); *United States v. Baskin,* 280 U.S.App. D.C. 366, 886 F.2d 383 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990) (Union Station; no articulable suspicion required since defendant held not seized when the police politely asked questions and looked at but quickly returned defendant's ticket because a reasonable person would have felt free to leave; defendant did not contest that he consented to questioning, dog sniffing of his bag, or search); *United States v. Carrasquillo,* 278 U.S. App.D.C. 138, 877 F.2d 73 (1989) (train in Union Station; held, consensual encounter when police approached defendant, who fit drug courier profile, questioned him, and removed bag, which defendant denied was his, after defendant became nervous and began sweating; held, alternatively, police had articulable suspicion); *United States v. Battista,* 278 U.S.App.D.C. 16, 876 F.2d 201 (1989) (train roomette; police investigation of defendant who fit drug profile and police dog alerted at his roomette, police told defendant he did not have to consent to search of suit bag and defendant said "That's okay," held, to be an investigative stop for which police had articulable suspicion); *United States v. Lloyd,* 276 U.S.App.D.C. 118, 868 F.2d 447 (1989) (Union Station; when defendant could not produce identification or ticket or identify friends he was visiting, and denied bag which police asked to search was his and that he knew contents of bag, and then walked away,

versed the grant of motions to suppress in two cases involving police questioning of persons on buses, rejecting the lower courts' concerns about the compressed area, the randomness of the selection of a suspect, and the absence of articulable suspicion. *United States v. Lewis & Cothran,* 921 F.2d 1294 (D.C.Cir.1990); *contra, Bostick v. State,* 554 So.2d 1153 (Fla.1989) (police questioning at random of passengers on bus and request to search luggage after advising that passenger had right to refuse, held an impermissible seizure in the absence of articulable suspicion). We have found no case in which a person who has cooperated fully with the police at the initial random confrontation—that is, provided appropriate and facially accurate responses to all police questioning and con-

sented to a search of all luggage that the police request to search—and engaged in no other conduct that can be reasonably characterized as indicative of criminal activity,[12] *see Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), is subsequently confronted for a second time by the police and requested to consent to a body search.[13]

The Supreme Court has yet to rule directly on whether the instant circumstances amount to a seizure, although *Florida v. Royer, supra* note 7, "plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *I.N.S. v. Delgado, supra,* 466 U.S. at 215, 104 S.Ct. at 1762.[14]

---

held no seizure as a result of questions when police did not tell him he was free not to answer and to walk away); *United States v. Brady,* 269 U.S.App.D.C. 18, 842 F.2d 1313 (1988) (search of train compartment and luggage; defendant denial that gym bag was his was tantamount to abandonment); *see also Gomez v. Turner,* 217 U.S.App.D.C. 281, 287, 672 F.2d 134, 142 (1982) (police request for identification does not in all cases constitute a seizure; the nature of the question alone, "without reference to the demeanor or the officer, the tone of voice or any other circumstance, cannot convert an otherwise inoffensive encounter into a seizure").

**12.** See discussion at 1361–1362, *infra.*

**13.** In *Reid v. Georgia,* the defendant filed a motion to suppress drugs seized from an abandoned bag when Drug Enforcement Agents approached him and his male companion and, after asking for their identification and tickets, asked them to return to the airport terminal they had just left. The court held as a matter of law that the agent could not have had reasonably suspected the defendant of criminal activity under *Terry v. Ohio, supra,* 392 U.S. 1, 88 S.Ct. 1868, on the basis that he arrived from Fort Lauderdale, a drug origination city, early in the morning at Atlanta airport when law enforcement activity is diminished, and he and his companion appeared to be trying to conceal that they were traveling together, and the two men apparently had no luggage other than shoulder bags. 448 U.S. at 441, 100 S.Ct. at 2754. The Court noted that other than the fact that the defendant preceded another person and occasionally looked backwards as he proceeded through the airport concourse, the facts described "a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Id.* The

Court thought that the agent's belief that the men were trying to conceal that they were together was "more an 'inchoate and unparticularized suspicion or hunch,' [*Terry v. Ohio, supra,*] 392 U.S. at 27, 88 S.Ct. at 1833, ... than a fair inference in the light of his experience, [and] ... simply too slender a reed to support the seizure...." *Id.*

In a concurring opinion, Mr. Justice Powell, who was joined by Chief Justice Rehnquist and Justice Blackmun, agreed that the fragmentary facts apparently relied on by the DEA agents did not justify a seizure, 448 U.S. at 442 n. 1, 100 S.Ct. at 2755 n. 1, and observed that the state courts "apparently assumed that the stop for routine identification questioning constituted a seizure, and addressed only the question whether the agent's actions were justified by articulable and reasonable grounds of suspicion. Because we similarly do not consider the initial seizure question in our decision today, that issue remains open for consideration by state courts in light of the opinions in *Mendenhall.*" 448 U.S. at 443, 100 S.Ct. at 2755. Chief Justice Rehnquist dissented on the ground that the police conduct did not implicate Fourth Amendment rights for the reasons stated by Justice Stewart in *Mendenhall.*

**14.** In *I.N.S. v. Delgado,* the Court rejected the claim that the entire workforce of two factories was seized during surveys of employees by immigration agents. The Court stated:

What is apparent from *Royer* and *Brown* [*v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) ] is that police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. *Cf.*

When Sergeant Brennan first approached appellant after he had exited the train and began questioning him about his identity and travel, there is, arguably, no evidence that a reasonable person, as defined objectively by the Supreme Court, would not have felt free to leave. Viewed as an isolated event, the oft-cited elements of intimidation, other than the presence and conduct of two officers, are not present. *Mendenhall, supra* note 7, 446 U.S. at 554, 100 S.Ct. at 1877. *See Michigan v. Chesternut, supra* note 7, 486 U.S. at 575, 108 S.Ct. at 1980; [15] *Barnes, supra,* 496 A.2d at 1043 (citing *I.N.S. v. Delgado, supra,* 466 U.S. at 216, 104 S.Ct. at 1762). On the other hand, it is at least arguable that appellant may have been seized at the point Sergeant Brennan asked him if he was carrying narcotics and, when he denied he was, asked to search his bag.[16] *United States v. Gonzales,* 842 F.2d 748, 752 (5th Cir.1988) (airport, two minute period of questioning; defendant was seized once police officer said he "was 'working narcotics' and requested to look in her bag, [since] a reasonable person no longer would have felt free to leave," as this implicitly told her she was a suspect in a drug investigation); [17] *United States v. Palen,* 793 F.2d 853, 857 (7th Cir.1986) (same). *Contra, Maragh, supra* note 11, 894 F.2d at 416 (reversing trial court ruling that in terrorem effect of officer's identifying himself as a narcotics officer after the defendant had denied possessing drugs implicated the Fourth Amendment, relying on prior decisions of the D.C. Circuit). This court, in *Kelly v. United States,* 580 A.2d 1282 (D.C. 1990), recently adopted the approach of the U.S. Court of Appeals for the District of Columbia Circuit, holding that a nonuniformed narcotics officer's approach, questioning and request to search a shopping bag held by the defendant was a consensual encounter. *Id.* at 1288.[18] Neither *Kelly* nor the decisions of the U.S. Court of Appeals for the District of Columbia Circuit reach the issue of whether a person is unlawfully seized when he is requested during a second confrontation to consent to a body search.

In contending that the successive confrontations by Sergeant Brennan resulted

*Schneckloth v. Bustamonte,* 412 U.S. 218, 231–34 [93 S.Ct. 2041, 2049–51, 36 L.Ed.2d 854] (1973). Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the persons [sic] refuses to answer and the police take additional steps—such as those taken in *Brown* [where two officers physically detained the defendant to determine his identify after he refused to identify himself]—to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure. *Id.* 466 U.S. at 216–17, 104 S.Ct. at 1762–63 (citing *Mendenhall, supra* note 7, 446 U.S. at 554, 100 S.Ct. at 1877; *Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. at 1879).

**15.** In *Michigan v. Chesternut,* the Court found no seizure where a police cruiser followed alongside a running individual, without activating its siren or flashers, without commanding the individual to halt, and without blocking his course. *Id.* at 569, 108 S.Ct. at 1977.

**16.** In view of the different factual circumstances in *United States v. Gayden,* 492 A.2d 868 (D.C. 1985), on which appellant relies for the proposition that he was seized when Sergeant Brennan's questioning became "sharply accusatory in character," we do not view that decision as dispositive here.

**17.** In *Gonzales,* the court held that the officer had articulable suspicion to seize the defendant since she deliberately sought to deceive the officers about the true duration of her stay in the area, failed to produce identification, arrived from a source city, appeared nervous and watchful as though she was expecting someone, was carrying little luggage, and was dressed in a loud-colored outfit. *Id.* at 753 (citing *Florida v. Royer*). Contrary to the dissenting opinion at 1369 n. 10, *United States v. Hurtado,* 905 F.2d 74 (5th Cir.1990) (en banc), did not overrule *Gonzales* on this point but only addressed the standard of proof for the government to show a consensual search. 905 F.2d at 75–76 (adopting the preponderance standard in view of Supreme Court decisions). *See also United States v. Galberth,* 846 F.2d 983 (5th Cir.1988) (when requested to consent to pat-down, articulable suspicion required).

**18.** The trial judge in *Kelly, supra,* found that the defendant had been seized and that the seizure was justified on the basis of the defendant's "very unrealistic answer," that he did not know what was in a paper bag that was inside his shopping bag. *Id.,* 580 A.2d at 1285.

in his seizure because he did not feel free to walk away, appellant relies chiefly upon *United States v. Morin,* 665 F.2d 765 (5th Cir.1982), which is instructive. Morin fit the drug courier profile and had prior narcotics convictions, and he was therefore placed under surveillance by law enforcement officers as he was traveling from Miami to Austin, Texas by way of Dallas/Ft. Worth. During a brief layover, a sergeant approached him in the Dallas/Ft. Worth airport, identified himself, and asked about Morin's itinerary and whether he was carrying narcotics. Morin denied that he was carrying narcotics and consented to a search of his carry-on bag, but refused to consent to a search of his checked bag. A police dog showed some interest in the checked bag but did not attack it, and Morin was allowed to board the airplane. However, the sergeant alerted Austin authorities of Morin's suspected criminal activity. In Austin, Morin was surrounded by officers while in the men's room and was told he was suspected of carrying narcotics. Morin produced identification and his ticket, and denied he had any luggage other than the carry-on bag. He was frisked and asked to go to the police office; there a body search was conducted. Drugs were found in the checked bag. The trial judge denied his motion to suppress.

Observing that the case was "very different from ... many airport stop cases," the Fifth Circuit reversed, holding "coercion inherent in successive stops of a suspect based on the same grounds of suspicion." 665 F.2d at 768. The court noted that the Dallas officials had sufficient grounds to make an investigatory stop.

*Id.*[19] The court focused on the details of the second stop, noting that Morin was "literally caught with his pants down," four officers were present, he was told he was suspected of carrying narcotics and asked to produce identification, his ticket was confiscated, he was told that the officers wanted to question him in their office, and he was asked if he had other luggage. Rejecting the government's position that no seizure had occurred since no weapons were displayed, Morin was not touched, and a calm attitude was displayed by the police, the court relied on the fact that the second stop was based on the same information that justified the first stop, and observed that successive stops "strongly indicate ... that an arrest has taken place. The coercion inherent in the successive stop situation must be acknowledged." *Id.* at 769.[20] The Eighth Circuit Court of Appeals has adopted the *Morin* analysis. *United States v. Ilazi,* 730 F.2d 1120, 1126, 1127 (8th Cir.1984) (noting the "inherently more intrusive and coercive" nature of a second stop).[21]

■ The government attaches no significance to the fact that Sergeant Brennan confronted appellant twice, he and Agent Dunn having encountered appellant and his companion a total of three times, and asked to conduct a body search after Agent Dunn's body search of Rivera, performed in appellant's full view, bore no fruit. Rather, the government contends that the second confrontation was as non-intrusive as the first and that appellant remained free not to engage in conversation with Sergeant Brennan or to consent to the body search. The trial judge viewed the successive confrontations as virtually indistin-

---

19. The court referred specifically to the information, obtained by prior investigation, that Morin was using an alias, traveling from a known drug center, had paid his hotel bill with cash and failed to retrieve the change he was due, had purchased his airline ticket very close to departure time and in cash, had prior narcotics arrests and was suspected of drug smuggling, had made a statement about his visit to Miami that was contradicted by hotel records, and had purchased two separate tickets for the flight to his final destination. *Id.* at 768 n. 9.

20. Notwithstanding the trial judge's finding of voluntary consent, the Fifth Circuit also held that "in light of the past stop and in view of the circumstances surrounding this [second] stop, effective voluntary consent was not given by Morin." *Id.* at 770 n. 10.

21. *Ilazi* involved a first encounter based on reasonable suspicion and a search during a second encounter after the police had probable cause to arrest. *Id.* at 1124. Ilazi did not contest the trial court's finding that the second encounter was justified because based on reasonable suspicion. *Id.* at 1125.

guishable, making no reference to the surveillance, the body searches or the length of time involved in all of the encounters between the officers and appellant and his companion. Viewing the totality of the circumstances to determine if a reasonable person would have felt free to leave, as we must, *Mendenhall, supra* note 7, 446 U.S. at 554, 100 S.Ct. at 1877, we hold as a matter of law that appellant's Fourth Amendment rights were implicated by the police conduct in this case.

The series of events in the instant case are not the typical brief, on-the-spot inquiry envisioned in the single contact cases. *See, e.g., United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989); *I.N.S. v. Delgado, supra,* 466 U.S. at 219, 104 S.Ct. at 1764. Rather, the officers' repeated attempts to dispel or confirm their suspicions about appellant and his companion communicated, when objectively viewed, an intention not to desist. Unlike the police in *Morin, supra,* and *Ilazi, supra,* 730 F.2d 1120, Sergeant Brennan and Agent Dunn did not have grounds for an investigatory stop of appellant or Rivera when they first approached them. By the time Sergeant Brennan requested to do the body search, appellant had given appropriate answers to all of the officer's questions, as in *Lewis,* and had also allowed a search of his bag. But Brennan and Dunn remained unsatisfied, followed appellant and Rivera, and confronted them a second time with requests to do body searches. A person could reasonably think that to refuse such a police search would lead to further questions and requests and thus would feel less than free to offer such refusal.

From appellant's initial confrontation with Sergeant Brennan until the time of his arrest, approximately thirty minutes

elapsed. During that time he was approached on two occasions and asked to consent to two searches—first of his bag and then of his body. Appellant was never informed that he did not have to consent to the searches.[22] After the initial confrontation, the officers maintained surveillance of the two men in the food court for about fifteen minutes from a distance of fifty to seventy-five feet, and then followed appellant and his companion to the cab stand area. Thus, appellant had seen the same two officers on three occasions as he and his companion were leaving the station. Even if, as a reasonable man, appellant thought that he was free to leave after Sergeant Brennan's initial questioning and search of his bag, by the time appellant was confronted in the cab stand area, a reasonable man could only conclude that he and Rivera were being followed.[23]

Further, despite the fact that he had fully answered all of Sergeant Brennan's previous questions, showed proper identification and an appropriate train ticket, given a plausible explanation for his presence in Washington, D.C. with Rivera, and allowed a search of his bag, appellant was unable to lose the officer, who had followed him out of the train station and was pressing him still further to permit a second search involving a more intrusive invasion of his person. Appellant knew that Sergeant Brennan was looking for narcotics and it defies common sense to think he did not know that Agent Dunn was also looking for narcotics when he questioned and body-searched Rivera. At the time appellant was asked to consent to a body search, he had just observed Rivera being subjected to a body search by Dunn without results.

Thus, when Sergeant Brennan requested to conduct a body search of appellant, a

---

**22.** While the court stated in *Kelly, supra,* 580 A.2d at 1286 n. 5, that the police "have no affirmative duty to inform those with whom they have contacts that they are free to leave," the Supreme Court has made clear that advice given by the police about a person's rights is a factor to be taken into account. *See, e.g., Mendenhall, supra* note 7, 446 U.S. at 558, 100 S.Ct. at 1879 (especially significant that the defendant was told twice that she was free to decline to

consent to the search); *see also Galberth, supra* note 17, 846 F.2d at 988 (one factor in determining voluntariness of consent).

**23.** Time was not a factor considered by the U.S. Court of Appeals for the District of Columbia Circuit in its most recent decision in this area. *Lewis & Cothran, supra,* 921 F.2d 1294 (single encounter-on-bus cases).

reasonable man would have realized that Sergeant Brennan suspected him of carrying narcotics. The sequence of events, capped by the unproductive body search of his companion, were tantamount to the officer's statement in *Florida v. Royer, supra* note 7, that appellant was suspected of carrying narcotics.[24] A reasonable person, under these circumstances, could do no less than believe that the officers had focused their attention on him in furtherance of their narcotics investigation, and the questions, concluding in a request to conduct a body search, became accusatory in effect. *See Gonzales, supra,* 842 F.2d at 752; *United States v. Borys,* 766 F.2d 304, 311 (7th Cir.1985); *United States v. Berry,* 670 F.2d 583, 597 (5th Cir.1982) (en banc), *United States v. Lewis,* 728 F.Supp. 784, 790 (D.D.C.1990). Indeed, believing that one is suspected of trafficking in narcotics, a reasonable person in appellant's circumstances would likely think that a refusal to submit to the body search at this point would itself signal to the suspicious officers that one had something to hide.[25] What the trial

judge found began as a consensual encounter between Sergeant Brennan and appellant clearly had escalated into something far more intrusive than polite questioning by a law enforcement official. *See I.N.S. v. Delgado, supra,* 466 U.S. at 215, 104 S.Ct. at 1762 (initially consensual encounter is transformed into seizure under Fourth Amendment if a reasonable person would have believed he was not free to leave) (citing *Mendenhall, supra* note 7, 446 U.S. at 554, 100 S.Ct. at 1877).[26]

The reasonable person free-to-leave test applied to the systematic operation of the drug intervention unit in a successive confrontation situation cannot rest simply on the fact that the officers were not in uniform, spoke politely, did not display a weapon, and did not physically block a person's passageway. Nor can the absence of evidence that the suspect became nervous or anxious be sufficient to diminish the inherently coercive nature of the request for a body search following a luggage search and surveillance as occurred here. *Cf. Ilazi, supra,* 730 F.2d at 1126; *Morin,*

---

**24.** In *Florida v. Royer, supra* note 7, the Court stated that

asking for and examining Royer's ticket and driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.

460 U.S. at 501, 103 S.Ct. at 1326.

**25.** *Cf. Florida v. Royer, supra* note 7, 460 U.S. at 512, 103 S.Ct. at 1331 (Brennan, J., concurring) ("It is simply wrong to suggest that a traveler feels free to walk away when he has been approached by individuals who have identified themselves as police officers and asked for, and received, his airline tickets and driver's license."); *Gomez, supra* note 11, 672 F.2d at 143–44 n. 18 ("That citizens can walk the street, without explanation or formal papers, is surely among the cherished liberties that distinguish this nation from others"); *see also Michigan v. Sitz,* —— U.S. ——, 110 S.Ct. 2481, 2490, 110 L.Ed.2d 412 (1990) (Brennan, J., dissenting) ("The Fourth Amendment was designed not merely to protect against official intrusions whose social utility was less as measured by some 'balancing test' than its intrusion on individual privacy; it was designed in addition to

grant the individual a zone of privacy whose protections could be breached only where the 'reasonable' requirement of probable cause standard were met") (quoting *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting)).

**26.** *Cf. Florida v. Royer, supra* note 7, where the court observed:

[A]t the time Royer produced the key to his suitcase, the detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity.

By the time Royer was informed that the officers wished to examine his luggage, he had identified himself ... and had attempted to explain the discrepancy between the name shown on his identification and the name under which he had purchased his ticket and identified his luggage. The officers were not satisfied, for they informed him they were narcotics agents and had reason to believe he was carrying illegal drugs. They requested him to accompany them to the police room.... What [began] as a consensual inquiry in a public space had escalated into a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions.... As a practical matter, Royer was under arrest.

460 U.S. at 502–03, 103 S.Ct. at 1326–27.

*supra,* 665 F.2d at 767–68. Indeed, the trial judge recognized the inconsistency between Sergeant Brennan's description of what happened and appellant's reaction, but dismissed his concern about possible psychological coercion by placing inappropriate emphasis on the fact that only Sergeant Brennan's testimony was before him. The issue was not the officer's perception of the totality of the circumstances, but that of a reasonable person in appellant's position. *Mendenhall, supra* note 7, 446 U.S. at 558, 100 S.Ct. at 1879. The officer's questioning did not have to assume an intensity marking a shift from polite conversation to harsh words to create an intimidating atmosphere; the same shift would result from being followed by two officers after cooperating fully and being repeatedly questioned by the same officers, whose stated purpose was to look for narcotics, and then being requested to consent to a second, far more intrusive personal search on a public street after observing an unproductive body search by the second officer of one's companion.[27] Given the officers' demonstrated persistence for nearly half an hour, a reasonable person could only conclude that he had no choice except to cooperate with the request for a body search; otherwise, as the officers' earlier conduct made clear, the officers would continue to follow and ask additional questions.[28]

The protections afforded by the Fourth Amendment do not recede when officers are frustrated in their ability to locate illegal narcotics. To hold otherwise would leave the individual to the whims of the officer whose hunches would convince him of the need for further inquiry and search

and leave the officer, dissatisfied with previous explanations, free to seek confirmation of his suspicions. Such police conduct is analogous to that about which the Supreme Court warned when it said, "This kind of standardless and unconstrained discretion is the evil the Court has discerned when in previous cases it has insisted that the discretion of the official in the field be circumscribed, at least to some extent." *Delaware v. Prouse,* 440 U.S. 648, 661, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979) (citations omitted) (random motor vehicle stops to check license and registration), *cited in Lewis, supra,* 728 F.Supp. at 787. Suspicionless seizures are particularly egregious when they are accompanied by body searches. Sergeant Brennan admitted that it was appellant's denial that he had drugs in his bag that caused him to become suspicious of appellant, and the officer never identified what information he and Dunn had received during their initial confrontations of appellant and Rivera that caused them to think that further surveillance was appropriate. As the cases make clear, the police have numerous ways of detecting persons involved in illegal drugs without resorting to indiscriminate body searches.

Unlike so many of the reported drug interdiction cases, nothing appellant and Rivera did was indicative of criminal conduct but rather theirs was the usual conduct of two arriving train passengers. Although Sergeant Brennan testified that appellant and Rivera were scanning the area when they were standing in the food line, this no more amounts to evidence of likely criminal conduct than do the facts that

---

**27.** We have found no case in which a court upheld the validity of a body search conducted in a public street. In *Galberth, supra* note 17, for example, the body pat-down took place in a ladies' room at an airport. *See id.,* 846 F.2d at 984.

**28.** Contrary to the assertion in the dissenting opinion, we do not adopt a rule that a second police encounter is, under all circumstances, a seizure. We do hold that a seizure occurred as a matter of law given the circumstances of this case, in which appellant had fully cooperated with the police during a first encounter, and

otherwise behaved like a usual traveler, and the police continued to keep appellant under surveillance for a period of approximately 30 minutes, ultimately approaching him a second time, performing a body search on his friend, and then asking him to submit to a body search. Under such circumstances, a reasonable person in appellant's position would not have felt free to refuse the police officer's request. In suggesting that we "adopt[ ] what is virtually a *per se* rule," dissenting opinion at 1367 n. 8, the dissent misreads both our approach, *see* 1359–1360, *supra* (focusing on the particular facts of this case), and our holding.

upon arriving at the concourse area, Rivera went to make a telephone call while appellant remained in the concourse and later they left without purchasing food and Rivera was pacing in the cab stand area as appellant stood by a pillar. This conduct is typical of arriving passengers and the fast food area invites such scanning, different offerings of food being located on all walls, which surround a general seating area. Nor did appellant give incomplete answers or travel under an assumed name or exhibit the signs of distress or physical reaction that has caused law enforcement officers to focus (or continue to focus) their attention on a suspect. *E.g. Sokolow, supra,* 109 S.Ct. at 1584;[29] *Florida v. Royer, supra* note 7, 460 U.S. at 494, 103 S.Ct. at 1322. That he and Rivera, who admitted they were together, separated while one was being questioned or searched by one of the two officers simply fails, as *Reid v. Georgia, supra,* makes clear, to rise to the level of articulable suspicion.

■ In short, there was nothing unusual about the behavior of appellant and his companion that would indicate likely criminal activity. As Sergeant Brennan conceded, he and Dunn were following their hunches and no more, and nothing the officers observed while surveilling appellant and Rivera provided reasonable grounds for suspecting criminal activity. The officers had no articulable link between a sequence of observed events and the criminal conduct toward which their efforts were directed; what they had—an "inchoate and unparticularized suspicion or hunch," *Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883,—would apply, as noted in *Reid v. Georgia, supra,* 448 U.S. at 441, 100 S.Ct. at 2754, to "a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure" of people who arrive from New York by train at Union Station.

Accordingly, since as a matter of law a reasonable person in appellant's circumstances would not have felt free to leave when confronted for a second time to allow a body search after having allowed a baggage search, there was not a consensual search and in the absence of articulable suspicion of criminal wrongdoing, the seizure of appellant violated the Fourth Amendment, *Terry v. Ohio, supra,* 392 U.S. 1, 88 S.Ct. 1868,[30] and the judgment must be reversed.[31]

BELSON, Associate Judge, dissenting:

One considering a case like this cannot help but realize that it raises troublesome issues regarding the measures that police may take in their efforts to gain relief from the current plague of drug trafficking and attendant murders and other serious crimes. There is agreement, I am confident, that no matter how laudable the goal

**29.** In *Sokolow, supra,* the police knew that the defendant had paid $2100 for two airline tickets with a roll of $20 bills, traveled under a name that did not match the name under which his telephone number was listed, his original destination was Miami (a source city for illicit drugs), he stayed in Miami only 48 hours even though a round trip flight from Honolulu to Miami takes 20 hours, he appeared nervous during his trip, and he did not check any of his luggage. 109 S.Ct. at 1583.

**30.** *See Maragh, supra* note 11, 894 F.2d at 419–20 (citing *Wong Sun, supra,* 371 U.S. 471, 83 S.Ct. 407); 3 LaFave, *supra,* § 8.2(d) at 190–91 ("'fruit of poisonous tree doctrine' ... invalidate[s] not only involuntary consent but also a voluntary consent," as, for example, "when the pressure upon the person from prior illegality is not so great that 'his will has been overborne' under *Schneckloth* [*v. Bustamonte,* 412 U.S. 218,

93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ] ... but yet it cannot be said under *Wong Sun* that his consent was 'sufficiently an act of free will to purge the primary taint.'").

**31.** Appellant also contends that Sergeant Brennan's question to him about whether he was carrying illegal drugs in his bag constituted an illegal search, and that because he was not told he had a right to remain silent, his Fifth Amendment rights were violated. In view of our disposition we do not reach appellant's Fifth Amendment claims. *See* Butterfoss, *supra* note 10, at 473 nn. 185 & 186 (a citizen's duty to cooperate with the police in an attempt to protect the community and apprehend others must be distinguished from an obligation to cooperate in implicating oneself in criminal activity; no duty exists in the latter circumstance). *But see* Lewis & Cothran, *supra,* 921 F.2d 1294 (single encounter-on-bus cases).

of any law enforcement effort may be, it must be conducted in a manner consistent with the liberties of our people guaranteed by the Constitution. My differences with the majority opinion are not at all with the principles it seeks to uphold, but with the manner in which it does so and the conclusions it reaches.

The words that Justice Blackmun wrote for the Supreme Court in *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), concerning investigatory pursuits call into question the majority's effort to fashion what, upon analysis, is revealed to be virtually a bright-line prohibition against second or successive encounters of the type involved in this case. Justice Blackmun wrote that both parties "in their attempts to fashion a bright-line rule applicable to all investigatory pursuits, have failed to heed this Court's clear direction that any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account" all the surrounding circumstances. *Id.* at 572, 108 S.Ct. at 1979. He went on to state that rather than adopting the bright-line rule proposed by either side and determining that the kind of police action in question "is or is not *necessarily* a seizure under the Fourth Amendment, we adhere to our traditional contextual approach, and determine only that, in this particular case, the police conduct in question did not amount to a seizure." *Id.* at 572–73, 108 S.Ct. at 1979 (emphasis in original). The trial judge in this case used the traditional contextual approach. I turn now to an evaluation of the trial court's determinations in light of the Supreme Court's teachings.

I would affirm the trial court's decision to deny the appellant's motion to suppress. The evidence adduced at the suppression hearing amply supports Judge Urbina's finding that the police did not employ duress or coercion during the sequence of events that led to the discovery of cocaine on appellant's person, and supports as well the trial judge's complementary findings

made on the basis of all the circumstances that it was made reasonably clear to appellant that he was able "to move on free from further discussion" at all times during his encounters with the police, and that he willingly gave his consent to the search.

My basic disagreement with the majority opinion arises from the fact that it gives unwarranted—virtually controlling—weight to the fact that the discovery of the cocaine came in the course of the second encounter between appellant and a plainclothes police officer. This factor was but one of many factors that the trial judge was required to consider in determining whether appellant was seized by the officer and whether he freely consented. Those other factors include the following: the two police officers who dealt with appellant and his associate were not in uniform;[1] they displayed neither badges nor weapons; the officer who spoke with appellant did so in a polite and conversational tone; the officer made his requests of appellant in the nonintimidating surroundings of Union Station; the officer never positioned himself in such a manner as to block appellant's way; the officer did not escort appellant to an interrogation room; he did not touch appellant before appellant had agreed to the search of his person; and after the first encounter, as appellant and his associate left a fast food stand, appellant's associate (who had had a parallel first encounter with another officer) spontaneously walked a short distance away from appellant and asked the officers for directions to the taxicab stand, behavior that obviously indicates that the associate did not then feel intimidated, and suggests that appellant did not feel intimidated either.

Based on the totality of the evidence, Judge Urbina found that in the first encounter Sergeant Brennan did not "in any way obstruct[ ] the movements of Mr. Guadalupe" or do "anything expressly or impliedly geared to create an aura of intimidation that would obviate Mr. Guadalupe's

---

1. The two law enforcement officers involved were Sergeant Brennan of the Narcotics Branch, Metropolitan Police Department, and Agent Dunn of the Drug Enforcement Agency. I will sometimes refer to them as officers or police officers.

understanding of his right to move on freely from further discussion." Crucial to a proper legal analysis is his further finding that Sergeant Brennan made it "reasonably clear ... that he was prepared to conduct himself in the same fashion in connection with the second encounter." With respect to consent to be searched, Judge Urbina found "that there was no intimidation, no duress of an actual or implied nature, and that there is no evidence that suggests that the defendant was particularly vulnerable or that he had the subjective state of mind or what would have made him vulnerable to the conduct as described by the government, and that the consent was, in fact, freely given." The judge went on to add that appellant "gave consent that was free."

In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Supreme Court addressed a situation in which the United States District Court had found that the suspect had accompanied drug enforcement agents to an office "voluntarily in a spirit of apparent cooperation," *id.* at 549, 100 S.Ct. at 1874, but the Circuit Court of Appeals evidently concluded that the agents' request that the respondent accompany them converted the situation into an arrest. The majority of the members of the Supreme Court agreed that "because the trial court's finding was sustained by the record, the Court of Appeals was mistaken in substituting for that finding its view of the evidence." *Id.* at 557, 100 S.Ct. at 1879. Like the federal circuit court that was reversed in *Mendenhall*, the majority here mistakenly substitutes its view of the effect in this case "as a matter of law" of the circumstances of a second encounter for the trial judge's findings, based upon the totality of the circumstances, that appellant had not been seized as of the time he freely consented to be patted down by the plainclothes officer. To use its language, the majority holds that "as a matter of law a reasonable person in appellant's circumstances would not have felt free to leave when confronted for a second time to allow a body search after having allowed a baggage search."

This court has recognized that its review of a trial court's decision on a motion to suppress is limited. *Lawrence v. United States*, 566 A.2d 57, 60 (D.C.1989). "We give deference to the trial judge's findings of fact, and must accept his resolution of conflicting testimony. Moreover, the judge's factual findings will not be disturbed unless they are clearly erroneous, *i.e.*, without substantial support in the record." *Id.* at 60 (citations omitted). Because there is substantial support for the findings of fact made by Judge Urbina, they cannot be considered clearly erroneous. The majority does not quarrel directly with the trial court's factual findings, but instead substitutes its determination that Guadalupe was seized before he was searched, thus vitiating his expressed consent to the search of his person. This appeal presents, therefore, the question whether the majority is ' "giving due deference to the trial court's findings of fact concerning appellant's encounter with the police,' " *id.* (quoting *Richardson v. United States*, 520 A.2d 692, 696 (D.C.), *cert. denied*, 484 U.S. 917, 108 S.Ct. 267, 98 L.Ed.2d 224 (1987)), when it supplants with its contrary conclusion of law the trial court's findings that the police officer's actions made it reasonably clear to Guadalupe that he could move on from the second encounter free from further discussion and that Guadalupe freely gave his consent to the second search.

The case law does not support the majority's view that the police actions vis-à-vis appellant constituted a seizure of his person as a matter of law in violation of the Fourth Amendment. "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). "There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." *Id.* at 34, 88 S.Ct. at 1886 (White, J., concurring). Moreover, there is no constitutional right

to be free of investigation. *United States v. Trayer*, 283 U.S.App.D.C. 208, 211, 898 F.2d 805, 808, *cert. denied* —— U.S. ——, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990). The key question in determining whether a person has been seized under the Fourth Amendment is "whether a reasonable person would have felt free to leave." *Lawrence, supra*, 566 A.2d at 60 (quoting *Richardson, supra*, 520 A.2d at 696); *see also Chesternut, supra*, 486 U.S. at 573, 108 S.Ct. at 1979; *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *Florida v. Royer*, 460 U.S. 491, 501–02, 103 S.Ct. 1319, 1326–27, 75 L.Ed.2d 229 (1983). Courts frequently find that a person is free to leave an encounter with the police even in situations "in which many of us would discern the existence of considerable pressure not to" leave. *Lawrence, supra*, 566 A.2d at 60. Such encounters between the police and people are generally deemed consensual " 'absent intimidating circumstances beyond the natural sense of obligation almost anyone would feel when a police officer begins asking questions.' " *Id.* at 62 (quoting *United States v. Barnes*, 496 A.2d 1040, 1044 (D.C.1985)). As the Supreme Court stated in *Delgado, supra:*

> police questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed her was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment.

466 U.S. at 216, 104 S.Ct. at 1762–63 (citation omitted).

The Supreme Court has described certain intimidating factors that could suggest a seizure, such as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall, supra*, 446 U.S. at 554, 100 S.Ct. at 1877 (Stewart, J., plurality opinion).[2] Another intimidating factor noted in some opinions is the retention of one's identification or travel ticket. *See, e.g., United States v. Lewis*, 921 F.2d 1294, 1297 (D.C.Cir.1990). The totality of the circumstances determine whether such a "seizure" has taken place. *Id.*

It is worth noting that even when the circumstances of an individual's encounter with police are "somewhat intimidating" as in *Chesternut, supra*, the Supreme Court has held that no seizure occurred. 486 U.S. at 575, 108 S.Ct. at 1980. Certainly the police encounter with Chesternut tended more in the direction of coercion and intimidation than the police contact with Guadalupe. In *Chesternut*, the police drove their marked patrol vehicle, without its siren or flasher activated, alongside a person who was running along the sidewalk until he eventually dropped certain contraband.[3] *Id.* Here Sergeant Brennan approached Guadalupe in plain clothes with no weapon visible, spoke courteously with him, and requested but did not demand his assistance in answering a few questions and consenting to a search, at first of his bag, and later of his person. The police contacts occurred in open public areas. Appellant's first encounter with the police was within the train station, the second in the outer reaches of the station near the cab stand.[4] Significantly, between the first

---

2. "The plurality opinion by Justice Stewart has become the law." *Lawrence, supra*, 566 A.2d at 62 n. 9; *see also Kelly v. United States*, 580 A.2d 1282, 1285 n. 4 (D.C.1990).

3. The instant case also presents a stronger basis for affirmance than *United States v. Burrell*, 286 A.2d 845, 846–47 (D.C.1972), where the police officer touched appellant's elbow and asked to speak to him; appellant here had no physical contact with the police officers until he consented to the search of his person. In *Burrell* we held that even the physical touching by the police did not convert the encounter into a seizure. *Id.*

4. I am not aware of a record basis for the majority's indication that the search of Guadalupe's person took place on a public street. Majority opinion at 1361 & n. 27.

and second time appellant and his associate were asked whether they agreed to searches, appellant's associate spontaneously left appellant's side as they walked away from a food stand, and went up to the two officers to ask directions. This fact strongly suggests that at that time appellant and his friend were not at all intimidated.

This court's recent opinion in *Kelly, supra* note 2, 580 A.2d at 1286, applied the governing principles of constitutional law to a case in which a police officer found a traveler in possession of illegal narcotics at Union Station under circumstances that were similar but not identical to those presented in this case. In *Kelly*, a police detective in plain clothes approached a traveler in much the same manner as Sergeant Brennan initially approached Guadalupe in this case. Following a brief conversation, Kelly acquiesced in the detective's request for permission to search the shopping bag that Kelly was carrying. The trial court found that Kelly had not been seized as of the time he gave his consent and that the search was consensual.

In affirming, we observed that "a determination of whether a seizure has occurred must take into account not one or two factors considered in isolation, but the 'totality of the circumstances.' " *Id.* at 1285 (citing *Mendenhall, supra,* and *Chesternut, supra* ). We noted the holdings of the Supreme Court in *Royer, supra,* and *Delgado, supra,* to the effect that law enforcement officers do not violate the Fourth Amendment merely by approaching an individual in a public place and asking him questions. *Kelly, supra* note 2, 580 A.2d at 1285–86. We listed the intimidating factors which the Supreme Court identified in *Mendenhall, supra,* as being indicative of a seizure. *Kelly, supra* note 2, 580 A.2d at 1286. We cited with general approval a number of recent opinions of the United States Court of Appeals for the District of Columbia Circuit, *id.* at 1287–88, and quoted the Circuit's following statement in *United States v. Joseph,* 282 U.S.App.D.C. 102, 892 F.2d 118 (1989):

> '[I]n this circuit the test of whether a seizure has occurred is whether a reasonable person, *innocent of any crime,* would have felt free to walk away under the circumstances.'
>
> ... [T]he police do not restrain liberty so as to constitute a seizure merely by approaching a citizen, directing toward him a question, or asking him for identification.

*Id.* at 105, 892 F.2d at 121 (quoting *Gomez v. Turner,* 217 U.S.App.D.C. 281, 288–98, 672 F.2d 134, 141–44 (1982) (emphasis added)).[5] We quoted with approval, *Kelly, supra* note 2, 580 A.2d at 1288, the Circuit's language in a case subsequent to *Joseph* that an encounter that involves "no more than approach, questioning, and official identification, does not constitute a seizure and does not require probable cause, articulable suspicion, or any other 'kind of objective justification.' " *United States v. Smith,* 284 U.S.App.D.C. 64, 66, 901 F.2d 1116, 1118 (citations omitted), *cert. denied,* — U.S. ——, 111 S.Ct. 172, 112 L.Ed.2d 136 (1990). In addition, we expressed our agreement with opinions of the circuit to the effect that the police "have no affirmative duty to inform those with whom they

---

5. The United States Court of Appeals for the District of Columbia handed down a significant opinion in the area of police-citizen encounters after we decided *Kelly*. In *United States v. Lewis,* 921 F.2d 1294 (D.C.Cir.1990), the Circuit reversed the rulings of district judges in two cases that particular encounters between police and citizens within interstate buses amounted to seizures of the citizens. The district judges had ruled that "the defendants were not 'free to leave'—and, therefore, were seized for Fourth Amendment purposes—because leaving would have required them to squeeze past police officers in the aisle and to risk missing the bus's

departure." *Id.,* at 1298. Reversing, the Circuit held that there was nothing unconstitutional about the encounter in the close confines of the bus "so long as the passengers' freedom to decline the interview and to go about their business has not been restrained 'by physical force or a show of authority.' *Terry v. Ohio,* 392 U.S. at 19 n. 16, [88 S.Ct. at 1879 n. 16].". At 1300.

Although the circumstances of *Lewis* were quite different from those of the case at bar, I think it is obvious that the potential for intimidation was greater in *Lewis*. Thus, the holding in *Lewis* suggests strongly that the majority here errs.

have contacts that they are free to leave." *Kelly, supra* note 2, 580 A.2d at 1286 n. 5.[6]

With respect to the validity of Kelly's consent to the search of the shopping bag, we pointed out that the voluntariness of the consent, like the issue of whether a seizure occurred, is to be determined from the totality of the surrounding circumstances. We noted that the trial court credited the detective's testimony and went on to say "[b]ecause this determination is essentially factual, '[w]e are bound to uphold the trial court's finding that a search was consensual unless such a finding is clearly erroneous.'" *Id.* at 1288 (quoting *Childress v. United States*, 381 A.2d 614, 618 (D.C.1977)).

Our holding in *Kelly* does not of itself mandate the outcome of this appeal because the facts in *Kelly* did not include a second encounter between the police and a citizen; *Kelly*, however, lays down principles that, if applied here, validate Judge Urbina's rulings and require affirmance.

Applying our holding in *Kelly* to the case before us, I note first that this court is bound by the trial court's subsidiary factual findings, so long as they are not clearly erroneous, regarding the non-intimidating fashion in which the two approaches to Guadalupe were conducted and, most importantly, the related finding that objectively Guadalupe was made aware that during the second encounter he was free to leave (and therefore not seized) and gave his consent to the pat-down freely.[7]

The majority makes frequent references to the totality of the circumstances approach used in *Kelly*, but in the end, it is the majority's analysis that, even given what transpired before the second encounter (beyond argument a consensual encounter under *Kelly*), the circumstances of the second encounter constituted a seizure *as a matter of law*.[8] Given the majority's explanation of its reasons for reversing Judge Urbina's careful findings of a consensual encounter, freedom to depart, and acquiescence to the search, there appears no other conclusion to draw than that the majority is adopting what is virtually a bright-line rule. That rule is that whenever there has been a first encounter and a luggage search of the type involved in this case and *Kelly*, a second encounter and request for a search of the person is so coercive that as a matter of law a reasonable person would not feel free to leave. The only additional factor the majority cites is that Guadalupe saw his associate, Rivera, agree to a second search just before Guadalupe did. But if that search of Rivera was consensual (and it appears clearly that the trial court was satisfied that it was), it is difficult to see why Rivera's voluntary acquiescence put Guadalupe into a position in which his consent could not also be voluntary. Aside from the negligible factor of the search of Rivera, which I submit was not a coercive factor, there is nothing that separates the majority's holding here from a rule that a second encounter accompanied by a request for a search of the person is necessarily a seizure.

6. The other opinions of the United States Court of Appeals for the District of Columbia Circuit which we cited with general approval in *Kelly* were *United States v. Maragh*, 282 U.S.App.D.C. 256, 260–61, 894 F.2d 415, 419, *cert. denied,* — U.S. ——, 111 S.Ct. 214, 112 L.Ed.2d 174 (1990); *United States v. Winston*, 282 U.S.App.D.C. 96, 892 F.2d 112 (1989), *cert. denied,* — U.S. ——, 110 S.Ct. 3277, 111 L.Ed.2d 787 (1990); *United States v. Baskin*, 280 U.S.App.D.C. 366, 370, 886 F.2d 383, 387 (1989), *cert. denied,* — U.S. ——, 110 S.Ct. 1831, 108 L.Ed.2d 960 (1990); and *United States v. Lloyd*, 276 U.S.App.D.C. 118, 122, 868 F.2d 447, 451 (1989).

7. It is curious that even though the majority opinion cites *Kelly*, it nevertheless states at page 1357 that "it is at least arguable that appellant may have been seized at the point Sergeant

Brennan asked him if he was carrying narcotics and, when he denied he was, asked to search his bag." In light of *Kelly* and the trial judge's findings here, that issue is not arguable.

8. Contributing perhaps, to the majority's adoption of what is virtually a *per se* rule that any second police encounter of the type involved here amounts to a seizure of the person is the majority's failure to recognize anywhere in its opinion that the circumstances are to be viewed through the eyes of "a reasonable person, innocent of any crime." *Kelly, supra* note 2, 580 A.2d at 1287 (quoting *United States v. Joseph*, 282 U.S.App.D.C. at 105, 892 F.2d at 121). A person innocent of crime would find actions like those of Sergeant Brennan less cause for concern than would a person transporting cocaine into the District of Columbia.

In arriving at his finding that appellant "gave consent that was free," the trial judge thoughtfully raised the question why a person carrying narcotics would consent to a search of his person. Judge Urbina observed that Guadalupe, having escaped detection once, might have "gambled" in the thought that the drugs were hidden well enough to escape detection. Doubtless, that might have been the reason. In the circuit's opinion in *United States v. Winston, supra* note 6, Judge Buckley made other valid observations about the phenomenon of giving consent under such circumstances, after having first noted that the question of whether a "seizure" occurs is an objective one making the subjective beliefs of the person approached "irrelevant." *Id.* 282 U.S.App.D.C. at 99–100, 892 F.2d at 115–16. He went on to state:

> The test recognizes that in some police-citizen encounters, a person's awareness of the duties of police officers to apprehend criminals, keep the peace, and prevent crime, "coupled with feelings of civic duty, moral obligation, or simply proper etiquette, will often lead a reasonable person to cooperate with law enforcement officers.... Accordingly, the presence of [an] officer as a figure of governmental authority does not, by itself, constitute the 'show of authority' necessary to make a reasonable person feel unfree to leave." *Gomez,* 672 F.2d at 141–42 (footnotes omitted); *see also Miranda v. Arizona,* 384 U.S. 436, 477–78, 86 S.Ct. 1602, 1629–30, 16 L.Ed.2d 694 (1966) ("It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement."). Thus, "to overcome the presumption that a reasonable person is will-

ing to cooperate with a law enforcement officer," *Gomez,* 672 F.2d at 142, it must be demonstrated that the officer's show of authority, in combination with other circumstances, is objectively "so intimidating that [an individual] could reasonably have believed that he was not free to disregard the police presence and go about his business." *Chesternut,* 108 S.Ct. at 1981 (internal quotations omitted).

*Id.* at 100, 892 F.2d at 116.[9]

Because the factual situation here has apparently not presented itself previously in the federal or local courts in the District of Columbia, the majority looks to other jurisdictions for authorization on the "issue of whether a person is unlawfully seized when he is requested during a second confrontation to consent to a body search." The majority relies heavily on *United States v. Morin,* 665 F.2d 765 (5th Cir. 1982), to support its apparent view that the answer to the question it poses is in the affirmative. But *Morin* is easily distinguishable from this case in that the second contact in *Morin* was patently a seizure of Morin made under extremely intimidating circumstances. After *Morin* was questioned in the Dallas airport and refused to let the authorities look at his luggage, he arrived at the next airport, Austin, in a very nervous state. He was sweating profusely and waited until last to exit the plane. He went directly to the men's room and, as the Fifth Circuit described it:

> As defendant stood before a urinal in the otherwise empty restroom, Wolsch stepped up to his right side, identified himself as a police officer and stated that he suspected defendant of carrying nar-

**9.** A number of cases decided by the U.S. Court of Appeals for the D.C. Circuit are consistent with my view that the trial judge's ruling should be upheld, although none deal specifically with a second encounter. *See, e.g., Winston, supra* note 6, 282 U.S.App.D.C. at 101, 892 F.2d at 117 (no seizure or implication of the Fourth Amendment when police officers question passenger who departed bus in D.C. in a non-coercive manner as "the Fourth Amendment is not necessarily implicated when a police officer initiates an encounter with a citizen he has no articulable reason to suspect of a crime."); *United*

*States v. Baskin, supra* note 6, 280 U.S.App.D.C. at 369–70, 886 F.2d at 386–87 (same); *United States v. Lloyd, supra* note 6, 276 U.S.App.D.C. at 121–22, 868 F.2d at 450–51 (no seizure, but voluntary consent to questioning and search of a passenger departing from a train from New York to D.C. at Union Station); *United States v. Brady,* 269 U.S.App.D.C. 18, 842 F.2d 1313 (1988) (search after consent on board an Amtrak train while it was stopped in D.C.); *see also United States v. Nurse,* 286 U.S.App.D.C. 303, 306, 916 F.2d 20, 23 (1990).

cotics. He asked for identification, which Morin supplied and Wolsch kept. Defendant's airline ticket was also taken at this time. Wolsch was accompanied by three other plain-clothes policemen, one of whom was standing on the other side of defendant and two others who were approximately ten to fifteen feet away. Wolsch told defendant that the officers wished to question him and asked him to accompany them to the airport police office. Officer Wolsch next inquired twice whether Morin had any luggage other than the carry-on bag which was next to him. He made this inquiry despite the fact that he knew the answer based on information from the Dallas law enforcement authorities. Defendant denied having any other luggage. He was then briefly frisked and taken to the airport police office, where he was subjected to a body search.

*Id.* at 767–68 (footnote omitted).

Because the police action in *Morin* was obviously intimidating and coercive, unlike the police encounters involved in the instant case, *Morin* is not authority for holding that the second encounter in the instant case was as a matter of law a seizure of the person. Most importantly, *Morin* did not adopt a *per se* rule, but held that the occurrence of a second stop was one factor, albeit a strong one, to be considered in determining whether the encounter rose to the level of an arrest.[10] *Id.* at 769.

While the majority relies on *Morin, supra,* which we have shown to be factually distinguishable, I think that the opinion of the Eighth Circuit in *United States v. Ilazi,* 730 F.2d 1120 (8th Cir.1984), is more instructive. *Ilazi* begins its analysis by distinguishing between 1) voluntary communication between law enforcement officers and citizens; 2) brief investigative stops which are limited seizures; and 3) full scale arrests. The Eighth Circuit then goes on to discuss successive encounters primarily in the context of whether they can transmute investigative stops into full scale arrests. *Ilazi* is valuable to the analysis here because of its instruction that the presence of successive stops is but one factor to be added to the list of factors to be considered in determining whether an interrogation rises to the level of an arrest. *Id.* at 1126–27;[11] *see also Zukor v. State,* 488 So.2d

---

**10.** The majority also cites *United States v. Gonzales,* 842 F.2d 748 (5th Cir.1988), overruled (on grounds explained below) by *United States v. Hurtado,* 905 F.2d 74 (5th Cir.1990) (en banc). Our holding in *Kelly, supra* note 2, and numerous other cases cited above are contrary to the holding in *Gonzales* that a person is seized when a police officer informs her that he is "working narcotics" and requests to look in her bag. *Gonzales, supra,* 842 F.2d at 752. I agree with *Gonzales'* acknowledgment that the appellate court owed deference to the trial court's factual finding that the suspect voluntarily consented to the police officer's request to search her bag. *Id.* at 755.

The viability of Fifth Circuit precedent on motions to suppress has been called into question by the recent en banc decision of that circuit overruling certain previous cases, including *Gonzales, supra,* cited by the majority, because an incorrect evidentiary standard was applied. *Hurtado, supra,* 905 F.2d at 75. The Fifth Circuit, now conforming its position with that of the Supreme Court in *United States v. Matlock,* 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974), will require the government to prove the voluntariness of consent for a search by merely a preponderance of the evidence instead of by clear and convincing evidence as had been required in such cases

as *Gonzales, supra. Hurtado, supra,* 905 F.2d at 76.

**11.** In *Ilazi, supra,* special state narcotics officers initially questioned two passengers who had deplaned at the Minneapolis–St. Paul International Airport because they had aroused suspicion by walking slowly "off the plane, staggering from left to right, sniffing and inhaling deeply after placing their fingers next to their noses." 730 F.2d at 1121. After the state officers had questioned the passengers at an airport bar, cooperating federal agents initiated a second encounter with the passengers after watching them leave the bar and proceed down the concourse, one walking "like 'a two-year-old child with a dirty diaper.'" *Id.* at 1123. During this second encounter, the agents identified themselves, asked the passengers questions, and examined their travel documents. After the officers noticed a bulge in one of the passenger's socks, they were taken to the airport office and placed under arrest. A search of Ilazi's person incident to the arrest revealed cocaine in his underwear and sock. The court in *Ilazi* rejected arguments that "an arrest occurs in every case involving successive stops." *Id.* at 1125. Instead the Eighth Circuit (as did the Fifth Circuit in *Morin*) considered the presence of successive stops as a factor in "determining when an interroga-

601 (Fla.Dist.Ct.App.), *review denied,* 496 So.2d 144 (Fla.1986).

Turning to the intertwined issue of consent to the search, Judge Urbina's findings of no intimidation are virtually dispositive. The trial court ruled, in part, as follows:

Court finds that there was no intimidation, no duress of an actual or implied nature, and that there is no evidence that suggests that the defendant was particularly vulnerable or that he had the subjective state of mind or what would have made him vulnerable to the conduct as described by the Government, and that the consent was, in fact, freely given.

The presence of consent *vel non* is a factbound determination, and this court is bound by the trial court's factual findings unless they are clearly erroneous. *Kelly, supra* note 2, 580 A.2d at 1288; *Childress v. United States,* 381 A.2d 614, 618 (D.C. 1977). Upon review of the record, I see no basis for overturning the trial court's finding of consent, especially where, as here, the court found after an evidentiary hearing that consent "was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte,* 412 U.S. 218, 248, 93 S.Ct. 2041, 2058, 36 L.Ed.2d 854 (1973).[12] The trial court properly concluded that consent to a search depends on the totality of the circumstances. *Id.* at 226, 93 S.Ct. at 2047; *Kelly, supra* note 2, 580 A.2d at 1288;

*Derrington v. United States,* 488 A.2d 1314, 1325 (D.C.1985), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 201 (1988). Other than the very fact of a second stop, the distant presence of a second officer, and Rivera's consent to a second search, this case presents no relevant factors that call into question what on its face was a valid consent, e.g., deficient mental or intellectual capabilities, show of force, detention or physical coercion. *See Kelly, supra* note 2, 580 A.2d at 1289.[13]

That this case involves a search of Guadalupe's person, rather than a search of appellant's bag, does not undermine the trial judge's determination that appellant's consent to the body search was voluntarily given. *See Mendenhall, supra,* 446 U.S. at 558–59, 100 S.Ct. at 1879–80 (consent to a strip search voluntary); *see also United States v. Wilson,* 895 F.2d 168, 172 (4th Cir.1990) (consent to search of person voluntary); *United States v. Galberth,* 846 F.2d 983, 986–88 (5th Cir.) (same), *cert. denied,* 488 U.S. 865, 109 S.Ct. 167, 102 L.Ed.2d 137 (1988). There seems to be no essential distinction between a consent to search a person's luggage and a consent to a search of one's person, although it is true that a pat down search is more intrusive than a luggage search and the finder of fact should consider that as one of the relevant surrounding circumstances in de-

---

tion rises to the level of arrest." *Id.* at 1126. The court stated:

we do not believe this stop exceeded permissible bounds [for investigative stops] *merely* because it was a second stop—even though, as a second stop, it was inherently more intrusive and coercive than the first. To so hold would preclude law enforcement officials from stopping a suspect a second time whenever the first stop did not provide probable cause, even though it tended to confirm their suspicions of illegal activity. We believe that to adopt a per se rule prohibiting successive investigatory stops would unduly hinder efforts to interdict illegal drug traffic. Because of the inherently transient nature of drug courier activity, immediate, on-the-spot investigations, which frequently involve talking directly to the individuals suspected of such activity, substantially enhance the likelihood that law enforcement officers will be able to prevent the flow of illegal narcotics into distribution channels.

*Id.* at 1126 (emphasis in original).

**12.** As *Schneckloth* requires, the trial judge focused on the state of mind of appellant Guadalupe, instead of that of a hypothetical reasonable person. *See United States v. Lewis, supra,* at 1300.

**13.** The trial court did not consider whether, even if the successive nature of the police officer's encounters of Guadalupe somehow converted the contact into a seizure for Fourth Amendment purposes, appellant's voluntary consent sufficed to purge any taint from the alleged seizure of appellant. *See United States v. Gonzales, supra* note 10, 842 F.2d at 755 (consent to search bag voluntary after being "seized" for purposes of the Fourth Amendment by federal agents); *see also Wong Sun v. United States,* 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963).

ciding whether one consented to it.[14] As the United States Court of Appeals stated recently in *United States v. Lewis, supra:*

> [T]he [trial] court complained that the performance of a body search in public was "patently offensive." *Lewis [v. United States]* 728 F.Supp. at 790. It may have been, but that begs the constitutional question. [Appellant] Lewis consented to the search, and that consent, rather than any resulting embarrassment, is the constitutionally relevant point.

*United States v. Lewis, supra,* at 1300.

Although the majority emphasizes the length of time the police had Guadalupe and his associate under surveillance, the significant time period is instead the actual length of the two encounters with police. *See Zukor v. Florida, supra,* 488 So.2d at 604 (distinguishes between time between contacts with police and time of actual contact with police); *United States v. Borys,* 766 F.2d 304, 311 (7th Cir.1985) (same) (police followed and intermittently questioned deplaning passenger for 45 minutes at airport terminal), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986); *cf. Royer, supra,* 460 U.S. at 500, 103 S.Ct. at 1325 (stop "must be temporary and last no longer than is necessary to effectuate the purpose of the stop."). Each of the two encounters here was of limited duration. It is important that there is no indication in the record that Guadalupe knew he was under surveillance during the span of time between encounters. Yet the majority frequently refers to the surveillance as a circumstance that supports its decision to supplant Judge Urbina's findings. Equally unsubstantiated by the record is the majority's reference to "repeated" questioning. Appellant was questioned only twice.

An unfortunate but quite possible result of the majority's opinion is that there will be more intrusive intervention by police during an initial encounter, involving perhaps both a search of luggage as well as a pat-down search of the person, in order to avoid the virtual certainty the majority holding provides that a court would deem a second encounter a seizure as a matter of law and suppress any illegal narcotics discovered as a result of that encounter.[15]

In sum, the record supports Judge Urbina's determination that Guadalupe freely gave his consent to a search of his person. In making his determination, the trial judge properly considered the totality of the circumstances, found that they did not create an "aura of intimidation," found that it was made reasonably clear to Guadalupe that he was free to leave during the second encounter, and did not take the view that the added circumstance of a second encounter that included a request for a search of the person required, as a matter of law, a ruling that Guadalupe was illegally seized and that his consent to a search was invalid. Because the trial judge's findings of fact were not "clearly erroneous" and his application of the law was correct, I would uphold his decision to deny the motion to suppress the narcotics, and would affirm.

---

**14.** It should be observed that pat down searches in public places are not truly extraordinary in today's world. Persons traveling on international flights must frequently undergo such searches. Moreover, the search found to be consensual in *Mendenhall, supra,* was a strip search of a female passenger by a female officer in a private room.

**15.** The government does not argue that the officer had grounds for a *Terry* stop at the time of the second encounter. It does point out, though, that after the first encounter and during the surveillance period, the two officers compared notes and agreed that Rivera and Guadalupe were acting suspiciously. The record does not justify an inference that the second encounter was merely a form of harassment. To the contrary, the officers acted reasonably in seeking a second encounter.